THE CITY OF CHICAGO, Plaintiff-Appellant, v. CHICAGO BOARD OF EDUCATION, Defendant-Appellant (Sheila Lyne, Contemnor-Appellant; Joel J. Bellows, Guardian-Appellee).

First District (4th Division)   Nos. 1—93—2126, 1—93—2232, 1—93—3670 cons.

Opinion filed December 21, 1995.

Board of Education—Law Department (Patricia J. Whitten and Robert J. Krajcir, of counsel), and Susan S. Sher, Corporation Counsel (Lawrence Rosenthal, Benna Ruth Solomon, and Jean Dobrer, Assistant Corporation Counsel, of counsel), both of Chicago, for appellants.

Bellows & Bellows, of Chicago (Joel J. Bellows, Laurel G. Bellows, and Adam K. Hollander, of counsel), for appellee.

PRESIDING JUSTICE HOFFMAN delivered the opinion of the court:

This case began in October 1992 as a rather straightforward municipal ordinance violation action by the City of Chicago (City) against the Chicago Board of Education (Board). In its complaint, the City alleged the existence of 13 violations of its municipal code within the Lawndale Academy, a public elementary school owned and operated by the Board. Six of those violations related to loose or fallen plaster in specified locations and the remaining seven violations involved the fire alarm system, exit signs, fire extinguishers, and a locked exit door. The City's complaint was pled in two counts. Count I sought monetary fines and count II sought, *inter alia,* an injunction mandating that the Board correct all of the violations alleged to exist within

the school. In the eight months that followed, this case was the subject of approximately 21 court hearings. During the course of those hearings, this action underwent a metamorphosis resulting in the appointment of a guardian *ad litem* for all of the students of the Lawndale Academy, an injunction against the City requiring it to conduct blood tests on all of those students, an order directing the incarceration of the commissioner of the Chicago health department until such time as she agreed to comply with the injunction, and a judgment against the Board in excess of $36,000 for fees and costs incurred by the court-appointed guardian. The City has appealed, its commissioner of health, Sheila Lyne, has appealed, and the Board has appealed.

Our disposition of these consolidated appeals requires some recitation of the proceedings which resulted in the entry of the orders we are called upon to review. However, because of the number of hearings that were conducted by the trial court and the specific issues raised by the appellants, we will summarize the procedural history of this case to the extent necessary for an understanding of our disposition.

At a hearing on January 21, 1993, the court fined the Board $100 for failing to correct the fire extinguisher and exit sign violations alleged in the City's complaint, which the court had ordered be rectified in a prior hearing. The order also provided that the Board would be fined $200 per day for each day after January 26, 1993, that the fire extinguisher and exit sign violations remained unabated. It was at this hearing that the court, acting *sua sponte*, directed the City to inspect the Lawndale Academy for the presence of lead-based paint. Up to this point in the proceedings, the court had not entered any orders requiring the Board to abate the conditions of loose and fallen plaster alleged in the City's complaint.

We have not been provided with a transcript of the trial court proceedings of February 4, 1993, but from the memorandum entered on the court's half-sheet, it appears that the court (1) vacated the *per diem* fine levied against the Board; (2) found that the school contained a substantial amount of lead-based paint; and (3) ordered the Board to prepare and file a lead abatement plan. For our purposes, it is important to note that the City's complaint did not seek any relief, either monetary or injunctive, resulting from the presence of lead-based paint within the Lawndale Academy.

The Board evidently complied with the order that it prepare and file a lead abatement plan, because a copy of such plan addressed to the City's health department and signed by representatives of the Board was filed on February 18, 1993. The plan outlined the work to

be performed at the school and reflected that the work would begin after March 1, 1993. The notations on the half-sheet for February 18, 1993, indicate "work to begin no later than 3-1-93," and reflect that the matter was continued to March 4, 1993. Apparently nothing of significance occurred at the March 4 hearing, as the half-sheet merely reflects a continuance to March 11, 1993.

The hearing on March 11, 1993, for which we have been provided a complete transcript, is of significance because it resulted in one of the orders from which the Board has appealed, and sets in motion a series of events which ultimately resulted in the entry of the orders from which the City and Commissioner Lyne have appealed. At that hearing, testimony was taken from three witnesses: a fire inspector employed by the City, a Board employee named Scott Vahldick who was supervising the work being done at the school, and Robert Roper, the principal of the Lawndale Academy.

Based upon his recent inspection of the school, the fire inspector testified that he observed extensive plaster damage to the walls and ceilings. When asked if any of the conditions in the school presented an immediate hazard, he opined that the condition of the plaster in room 330 was dangerous because it appeared that it could fall at any time. He also testified that he observed work going forward to remove lead-based paint and to repair the plaster.

Vahldick testified that he was familiar with both the work going forward at the school and the lead abatement plan that had been submitted by the Board and approved by the City's health department. He informed the court that 25 workmen were engaged at the school, 16 hours per day, seven days per week, in an effort to complete all of the work within nine weeks. Vahldick described in detail the work being performed and the precautions being taken to ensure that the work was performed safely. Specifically, he testified that access to the work areas was restricted to the workmen and himself, and that the work areas were sealed off from the remainder of the school and put on a separate ventilating system to ensure that during the lead paint removal process, none of the material could become airborne and escape into the general school atmosphere. He also described the protective clothing and masks that the workmen were using to ensure their safety during the removal process. Vahldick testified that all the plaster in the school would be repaired with the completion of the lead abatement plan, which he estimated would take place by May 10, 1993. Vahldick opined that none of the conditions at the school presented any danger to the students.

Roper testified that he too was familiar with the work being done at the school, that it would be completed on schedule, and that it was

proceeding safely. He advised the court that the students were being relocated to other areas of the school to ensure that they would not be exposed to the work areas. In response to questions by the court, Roper stated that 950 students ranging in age from 3 to 14 attended Lawndale Academy. Of these students, only 99 were assigned to classrooms that were scheduled for lead paint abatement.

After admonishing the attorneys that the hearing was for status only, the court entertained argument from attorneys for the City and the Board. Counsel for the City informed the court that the City's health department had determined that the lead-based paint present in the school did not constitute any hazard or danger. He further stated that the City was prepared to accept Vahldick's testimony that adequate precautions were being taken to ensure that the Board's lead paint abatement project would not result in any contaminated waste being released into the general school atmosphere, and that the City was satisfied with the Board's progress to date.

After hearing arguments, the trial court commended the Board on the manner in which it had responded and went on to observe: "I don't know if anything more could be done to abate what this court has declared to be an injurious and hazardous situation." Referring to the presence of lead-based paint in the school building, the trial judge stated: "I don't know whether or not any child has been damaged by this condition." After noting that 950 children attend the Lawndale school, the court stated that the students "are certainly under-represented and are in dire need of someone to look at their situation and to see whether or not there has been any damage." Immediately thereafter, the court, *sua sponte,* appointed Joel J. Bellows as the students' guardian *ad litem.* The Board objected to the appointment. After hearing the Board's objection and comments from Bellows, who by coincidence happened to be present in the courtroom, the court reaffirmed the appointment, observing that "[t]he children's rights have to be protected[,] and if[,] in fact, these children have suffered irreparable damage, something should be done about it." The court concluded by stating:

> "This[,] gentlemen, is not an adversary proceeding hearing, and there is not one person here that is not firmly convinced as I am that the primary mission of this court is to protect these children. We want to ascertain whether or not there is any damage and I am certain we are all in agreement that there is none. Now, if there has been some, we must do our best to abate and correct it. It should be removed as soon as possible and I have stated before that the Board of Education has taken extraordinary measures once they became aware of the situation."

A draft order memorializing the court's findings and orders of March 11, 1993, was entered on March 17, 1993. That order recited the court's finding that the Lawndale Academy "may constitute an environment injurious to the health and welfare of the children who have attended the Lawndale Academy at various times and from time to time during at least the past two years." The court went on to order that (1) Bellows be appointed guardian *ad litem* for all students attending Lawndale; (2) Bellows take whatever action he deems necessary to represent the students; (3) the City's department of health test the students to ascertain the level of lead in their systems; (4) the Board make available to Bellows the names, addresses, ages, and enrollment records of the Lawndale students; (5) Bellows confer with all those who have knowledge of the conditions existing at Lawndale during the past two years and those who have knowledge of injury, if any, to the students as a result of those conditions; and (6) Bellows report to the court from time to time.

On March 18, 1993, the Board moved to stay its order of March 17. The Board reminded the court that the City was satisfied with the progress being made on Lawndale's lead abatement program and that it found no danger to the students. The Board went on to suggest that the court had abused its discretion in entering its order and requested a stay. The City pointed out that the complaint in this case did not charge the Board with any Code violations relating to the presence of lead-based paint and sought no relief against the Board in that regard; that inspections of the school by experts from the department of health revealed no hazards related to lead paint; and that all of the court's findings and orders relating to the abatement of lead paint at the school, along with the appointment of Bellows, were done *sua sponte* and without any request by the City. The City suggested that the court was acting outside of its subject matter jurisdiction and joined the Board in requesting that it discharge Bellows and stay its order. Bellows opposed the motion.

Prior to ruling, the court stated:

"Now, I am a judge that is not versed in the lead abating program or procedures. I can perceive that the experts think there is a danger here. That this danger has been ongoing for a number of years. All I want, all this court is looking for is to ascertain whether or not these children as in your words, have been poisoned. If they have been poisoned, then let them be represented. Let the representative of the children do what is necessary, either against the Board of Education, the City of Chicago, or whatever the problem may be."

After referencing a number of cases which articulate the general

proposition that the court has a duty to protect the interests of minors, the court denied the Board's motion.

The next hearing of consequence took place on March 23, 1993, regarding the Board's motion for an extension of time to comply with the order directing it to turn over specified information relating to the Lawndale students. After denying the extension, the court requested information as to the status of compliance with the order requiring the department of health to test the students of the Lawndale Academy. Doctor Alina Fernandez, the director of Child Health Programs for the City's department of health, was sworn as a witness. After describing her expertise in matters relating to lead poisoning and its prevention, Fernandez testified that the investigative procedure for determining the existence of lead poisoning within the student population at Lawndale would include testing the "at-risk" students, which she identified as those under age seven. Fernandez stated that children seven years of age and older are not considered at risk. She also indicated that it might be reasonable to test students, regardless of age, who were assigned to rooms within the school that contained high levels of lead contamination. It was her opinion that testing all of the students would only be warranted if the testing of the at-risk population revealed lead levels greater than that which would be expected in the general population. She testified that if the at-risk students tested at levels greater than 20 micrograms per deciliter (mcg/dl), their homes would also be examined as a source of contamination.

At the next hearing on March 25, 1993, the City's fire inspector testified that work was going forward at the school in a safe and workmanlike manner. We have not been provided with the transcripts of any hearings in this case from March 25, 1993, until May 7, 1993, but from an examination of the half-sheet, it appears that the matter was before the court on April 1, April 20, and April 29, 1993.

What the record does reflect is that on April 19, 1993, Bellows filed his own affidavit stating that his examination of Lawndale Academy on March 15 and 16, 1993, revealed the existence of peeling paint caused by water damage. Bellows also gave the opinion that blood levels equal to or greater than 10 mcg/dl constitute an "unhealthful condition" and, as his sole support for this finding, provided excerpts from a report of the United States Center for Disease Control. Also attached to Bellows' affidavit were the results of the City's tests of 122 Lawndale students, showing that 52% tested at levels above 10 mcg/dl. Based upon these results, Bellows concluded that intervention was critical to the well being of the students and that the peeling paint at the school was, "at best, a contributing fac-

tor in the children's elevated blood levels [and,] [a]t worst, *** responsible for the elevated levels." Based upon his analysis of the data relating to the testing of the Lawndale students, the conditions that he observed at the school, the Board's position as the custodian of the students, and his status as an attorney licensed in Illinois, Bellows set forth in his affidavit that he

> "believes and states the facts to be that: (1) The peeling lead based paint condition at the Lawndale Academy constituted an 'environment injurious' to the health and well being of the students as that term is used in Section 2—3(1)(b) of the Juvenile Court Act of 1987 ***; (2) *** the Board has violated the civil rights of the students in the school ***; (3) *** the Board is guilty of child 'neglect' as that word is used in Section 2—3(1)(a) of the Juvenile Court Act of 1987 ***; and (4) *** the Board is not a fit and proper custodian of the students in the Lawndale Academy."

On April 23, 1993, the Board filed a motion to strike Bellows' affidavit, arguing in the strongest of terms that he was unqualified to render the medical opinions contained therein. The Board also objected to the court's consideration of the affidavit at the April 20, 1993, status hearing and to fact that the court had denied the Board any opportunity to cross-examine Bellows.

The record contains a draft order entered on April 26, 1993, *nunc pro tunc* April 20, 1993, wherein the court found that "[c]onsistent with the October 1991 pronouncement of the U.S. Public Health Service/Centers for Disease Control, the incidence of blood lead level of at least 10 micrograms per deciliter in more than 50% of the 122 student test population indicates an unhealthful and dangerous condition has existed at Lawndale School." The court ordered that the parents be notified of their children's test results and of the opportunities for intervention activities. The court further mandated that parents of children who had not been tested be notified of the test results and that they be offered the opportunity to have their children tested.

The City filed a motion to vacate on April 30, 1993, evidently believing that an injunctive order had been entered against it on that date requiring the health department to conduct venous blood tests on all the students at Lawndale. In addition to the affidavit of the City's health department commissioner, the motion was supported by the affidavits of six medical doctors, including the chief of the Lead Poisoning Prevention Program of the United States Centers for Disease Control, the Director of the Illinois Department of Public Health, the chief of the lead clinic at Cook County Hospital, and the director of Child Health Programs of the Chicago department of

health. Those affidavits in the aggregate concluded that lead screening efforts should focus on children age six or under, that blood-lead levels under 20 mcg/dl do not warrant emergency medical treatment or therapy, that the most common cause of lead poisoning in children under age six is the ingestion or inhalation of dust or paint chips in their own homes, and that the testing of children above age six is medically unwarranted and unnecessary.

The City's motion to vacate was heard on May 7, 1993. At that hearing, after the City presented its position on the matter, Bellows acknowledged that he had not requested that the court order the health department to do further testing. After hearing the entire argument on the City's motion, the court asked to see a copy of its injunctive order, and after examining the order of April 26, 1993, the court correctly observed that the City had not been ordered to perform any further testing. Acknowledging that it had not yet read the affidavits in support of the City's motion, the court took the motion under advisement and continued the case to May 13, 1993.

On May 13, 1993, after recounting its findings as to the hazards to which the Lawndale students had been exposed and its determinations of which students were at risk from those conditions, the court denied the City's motion to vacate. Thereafter, the City called its fire inspector to testify. The inspector informed the court that the Board had corrected all the Code violations charged in the City's complaint, with the exception of a test of the new fire alarm system and a small amount of plaster work to be completed in the gymnasium. On that same day, Bellows filed a motion requesting that the court enter a schedule to "begin remediation of children lead poisoned at Lawndale Academy." In that motion, Bellows requested that the Board be ordered to (1) schedule a parent program for May 19, 1993, and publicize the event by having students take home a notice he would prepare for the Board; (2) schedule a faculty program; and (3) implement a program of nutrition in school lunches as required by Bellows.

The case was again before the court on May 21, 1993, at which time Bellows' proposed remediation schedule was addressed. The court approved a form notice to the parents of the Lawndale students along with a consent form to obtain free blood testing for lead poisoning to be conducted by the health department.

On June 3, 1993, over the City's objection, the court ordered the City to conduct blood tests on all Lawndale students whose parents had executed consent forms and who had not been previously tested for lead poisoning. The City was ordered to complete testing within seven days and to file the results with the court.

On June 15, 1993, Bellows filed a verified petition seeking an order against the City and "the responsible Executive Officer" to show cause why they should not be held in contempt of court for failure to comply with the court's order of June 3, 1993. On the same day, the City filed its notice of appeal from the June 3 order.

On June 16, 1993, at 9:30 a.m., after hearing the arguments of Bellows and the City, the trial court (1) denied the City's motion to stay the order of June 3, 1993, pending its appeal; (2) granted Bellows' petition for a rule to show cause; (3) issued a rule to show cause against Commissioner Lyne; and (4) continued the rule for service and hearing to 2 p.m. At the 2 p.m. hearing, Lyne appeared before the court, acknowledged her awareness of the June 3 order, gave reasons why she had not ordered her department to comply, and in response to a specific inquiry by the court, declined to order her department to test the Lawndale students. The trial court found Lyne guilty of indirect civil contempt of court and ordered her incarceration until such time as she was willing to instruct her department to commence testing as ordered. The City and Lyne immediately filed their notice of appeal, and, acting on their emergency motion, this court stayed the order of incarceration pending disposition of this appeal.

On July 20, 1993, Bellows filed a petition for interim attorney fees supported by his affidavit and time sheets. Bellows requested an award of $35,657.50 in fees and $1,338.11 in costs, attributing $25,566.25 in fees and $1,207.94 in costs to the Board, and $10,091.25 in fees and $130.17 in costs to the City. Both the City and the Board opposed Bellows' petition, arguing that any award of fees would be improper. Additionally, the Board addressed the propriety of Bellows' appointment in the first instance.

At the September 9, 1993, hearing on the fee petition, the Board renewed its objection to Bellows' appointment and argued the impropriety of awarding any fees against it. The City also indicated its belief that Bellows' appointment was inappropriate, reminding the court that no party ever requested the appointment and that Bellows acted on behalf of nonparties who "made no claim," "[a]sked for no relief," "[a]nd prevailed on nothing." After hearing the arguments of Bellows and the attorneys for the City and the Board, the court ordered the Board to pay Bellows the entire amount he sought for fees and costs. On September 13, 1993, the court entered a judgment against the Board for the fees and costs awarded to Bellows, and included in that order the requisite findings for enforcement and appealability under Supreme Court Rule 304(a) (134 Ill. 2d R. 304(a)). The Board filed its notice of appeal on October 8, 1993.

In urging reversal of the injunction entered against it and the order holding Lyne in contempt, the City argues that (1) the injunction is void for want of jurisdiction; (2) the injunction is not supported by any cognizable right; (3) no principle of common law, statute or ordinance obligates the City to perform the testing ordered; (4) the injunction was entered against the City in the absence of any claim pending against it and was in favor of nonparties; (5) the factual findings supporting the order were contrary to the only competent evidence before the court; and (6) the injunction was an unwarranted judicial intrusion on the manner in which a municipality lawfully decides to perform discretionary acts.

The Board argues that (1) the court lacked jurisdiction to appoint Bellows as the guardian *ad litem* of the Lawndale students and therefore its order appointing Bellows was void; and (2) there was no legal justification for ordering Bellows' fees to be paid by a party to this litigation, and even if there were some justification, the court abused its discretion in directing the Board to pay the entire fee.

Bellows argues in support of his appointment and the entry of the injunction requiring the City to conduct the blood tests by general references to the inherent plenary power of the courts of this State to protect the interests of minors, and the authority of courts of equity to fashion remedies necessary to protect those interests. He argues that since the trial court possessed the authority to appoint a guardian to protect the students' interests, it necessarily possessed the authority to provide for the fees of the guardian and had the discretion to direct that those fees be paid by the party whose fault precipitated the need for a guardian in the first instance.

Since our disposition of these consolidated appeals is based upon the trial court's lack of jurisdiction to enter the orders appealed from, we need not address all of the issues raised by the parties.

■ No one quarrels with the general proposition articulated by the trial court and the guardian to the effect that courts have not only the inherent plenary power to protect the interests of minors, but also a duty to do so. (*Tymony v. Tymony* (1928), 331 Ill. 420, 163 N.E. 393; *Gibbs v. Andrews* (1921), 299 Ill. 510, 132 N.E. 544.) However, while the court's power in such matters may be plenary, it is not boundless. Courts do not take upon themselves the care of all minors within the territorial limits of their powers. Absent some statutory provision to the contrary, a court treats a minor as its ward only when some suit is instituted relative to the person or property of the minor (*Thomas v. Thomas* (1911), 250 Ill. 354, 95 N.E. 345), and the minor is served with process (*Greenman v. Harvey* (1870), 53 Ill. 386). The appointment of a guardian *ad litem* for a minor who

has not been joined as a party and who has not been served with summons does not vest a court with jurisdiction over the person of the minor. (*Hickenbotham v. Blackledge* (1870), 54 Ill. 316.) Further, a court's inherent power is not synonymous with its subject matter jurisdiction. *Ardt v. Illinois Department of Professional Regulation* (1992), 154 Ill. 2d 138, 607 N.E.2d 1226.

■ In general terms, the subject matter jurisdiction of the circuit courts of this State is the power to hear a given class of case. As derived from the Illinois Constitution, that jurisdiction extends to all justiciable matters with only limited exceptions not pertinent to this case. (Ill. Const. 1970, art. VI, § 9.) A justiciable matter is one which involves the adverse legal interests of the parties to an action. (*Ligon v. Williams* (1994), 264 Ill. App. 3d 701, 637 N.E.2d 633.) In application to any particular case, the subject matter jurisdiction of the court is the power to hear and determine that controversy. (*In re Marriage of Fox* (1989), 191 Ill. App. 3d 514, 548 N.E.2d 71.) "The court's authority to exercise its jurisdiction and resolve a justiciable question is invoked by the filing of a complaint or petition." (*Ligon*, 264 Ill. App. 3d at 707; see also *Fox*, 191 Ill. App. 3d at 520.) The pleadings of the parties frame the issues in controversy and circumscribe the relief that the court is empowered to order. *Ligon*, 264 Ill. App. 3d at 707.

■ In this case, the only pleading filed by any party seeking affirmative relief was the complaint filed by the City. That complaint sought only an adjudication of the City's claim that the Board maintained the Lawndale Academy in violation of certain specified sections of the Municipal Code of Chicago, section 1—4—010 *et seq.* The trial court was never presented with any pleading by any party to this cause seeking relief against the City or in favor of the students of the Lawndale Academy. Courts, no matter how well meaning, cannot *sua sponte* interject issues into a controversy that have not been presented to them for adjudication by the parties, and then proceed to decide those issues and grant relief to nonparties. When, as in this case, the court does just that, it exceeds its subject matter jurisdiction and its orders are void. *Ligon*, 264 Ill. App. 3d at 707.

We do not mean to suggest that in a proper case a circuit court lacks subject matter jurisdiction to enter an injunction or to appoint a guardian *ad litem* and provide for his fees. To the contrary, circuit courts do possess such powers, but those powers may only be exercised in the context of adjudicating a justiciable matter presented to the court by the parties to the cause.

Based upon the foregoing analysis, we find that the trial court exceeded its subject matter jurisdiction when it (1) appointed Bellows

as the guardian *ad litem* for the Lawndale Academy students; (2) enjoined the City to conduct blood testing on those students; and (3) entered judgment against the Board for the fees and costs incurred by Bellows. Further, any finding of contempt based upon the violation of a void injunction must be reversed. (See *People v. Shukovsky* (1988), 128 Ill. 2d 210, 538 N.E.2d 444.) We therefore vacate the order appointing Bellows as guardian *ad litem*; vacate the judgment entered against the Board for Bellows' fees and costs; vacate the order enjoining the City to conduct blood tests on all of the Lawndale students; and reverse the order finding Lyne in contempt of Court.

No. 1—93—2126, Order vacated.
No. 1—93—2232, Order reversed.
No. 1—93—3670, Judgment vacated.

CAHILL and THEIS, JJ., concur.