(No. 90340

BELLEVILLE TOYOTA, INC., Appellee, v. TOYOTA MOTOR SALES, U.S.A., INC., *et al.*, Appellants.

*Opinion filed March 15, 2002.—Rehearing denied May 29, 2002.*

328

FREEMAN, J., joined by McMORROW, J., dissenting.

Thomas M. Crisham, Michael C. Bruck, David M. Jen-

kins and Jean M. Prendergast, of Crisham & Kubes, Ltd., and William R. Quinlan, all of Chicago, for appellants.

Richard A. Mueller, Dudley W. Von Holt and Edwin G. Harvey, of Thompson Coburn L.L.P., of St. Louis, Missouri, and Thomas Q. Keefe, of Belleville, for appellee.

JUSTICE FITZGERALD delivered the opinion of the court:

Plaintiff, Belleville Toyota, Inc., sued defendants, Toyota Motor Sales, U.S.A., Inc., and Toyota Motor Distributors, Inc. Defendants are, respectively, the authorized importer and the wholesale distributor of new Toyota vehicles in the United States. Plaintiff claimed that defendants breached certain dealership agreements by allocating to plaintiff less than the full number of Toyota vehicles to which plaintiff was entitled. Plaintiff also claimed that defendants' conduct violated the Motor Vehicle Franchise Act (Act) (815 ILCS 710/1 et seq. (West 2000)). Following a jury trial, the circuit court of St. Clair County entered a multi-million dollar judgment against defendants. On appeal, the appellate court rejected defendants' numerous claims of error and affirmed the judgment of the trial court. 316 Ill. App. 3d 227. We granted defendants' petition for leave to appeal. 177 Ill. 2d R. 315. For the reasons discussed below, we affirm in part and reverse in part the judgment of the appellate court and remand this matter to the circuit court for further proceedings.

## BACKGROUND

In 1973, Bill Newbold acquired an ownership interest in a Toyota dealership in Belleville, Illinois, and took over the dealership's day-to-day operations. The dealership, doing business under the name Bill Newbold Toyota, was one of approximately 100 Toyota dealerships in the five-state Chicago region. Bill Newbold, along with

his son, Kent, operated the dealership under a series of dealer agreements with defendants. The earliest of the dealer agreements at issue in this litigation was executed in June 1980, and provided for a six-year term. Under the 1980 agreement, plaintiff was required to submit orders for Toyota products on forms supplied by defendants. In the event of a shortage of Toyota products, the "unit allocation" provision of the contract required that vehicles be allocated to plaintiff "principally on the basis of sales performance during the most recent representative period of adequate supply."

In 1986, upon expiration of the 1980 agreement, the parties entered into a new dealer agreement with a one-year term. In 1987, the parties entered into another one-year agreement, and in 1988, entered into a six-year agreement. Under the 1986, 1987 and 1988 agreements, defendants were to use their "best efforts" to provide Toyota products to plaintiff, subject to available supply. In the event of a shortage, defendants were required to allocate Toyota products among its dealers in a "fair and equitable manner."

In June 1989, defendants notified plaintiff of their intent to open a new Toyota dealership in Collinsville, Illinois. In response, on August 8, 1989, plaintiff filed a complaint against defendants under the Act, seeking to enjoin them from establishing a Collinsville dealership. Plaintiff twice amended its complaint to include claims for breach of contract and additional violations of the Act. Plaintiff alleged that defendants failed to allocate Toyota vehicles in the quantities contractually required and that defendants fraudulently concealed their conduct. According to plaintiff, defendants' breach was not discovered until the fall of 1990. Plaintiff further alleged that, in violation of the Act, defendants' allocation of vehicles was arbitrary, capricious, in bad faith, and unconscionable; defendants concealed their arbitrary and

capricious allocation system; and defendants' conduct was willful and wanton. The trial court dismissed with prejudice plaintiff's claim for injunctive relief and denied defendants' motions challenging, *inter alia*, the timeliness of plaintiff's claims. In 1997, following several years of discovery, the parties proceeded to trial.

At trial, plaintiff maintained that, as the result of certain import restrictions under a voluntary restraint agreement (VRA) between the United States and Japan, there was a shortage of Toyota vehicles during the 1980s. Plaintiff contended that, due to this shortage, defendants were obligated, under the "unit allocation provision" contained in the 1980 dealer agreement, to allocate Toyota vehicles to the dealers based on "sales performance during the most recent representative period of adequate supply." According to plaintiff, defendants failed to do so. In the alternative, plaintiff maintained that, even absent a shortage of Toyota vehicles, the allocation system defendants used, which they described to plaintiff as a "turn and earn" system, did not comply with the 1980 agreement requiring an order system. Plaintiff further maintained that defendants' so-called "turn and earn" system, which purportedly allocated cars based on how quickly a dealer moved its inventory, did not function in this way. Rather, the vehicle allocation system was arbitrary and subject to manipulation, and was used in a discriminatory way, all in violation of the Act, as well as the four dealer agreements at issue in the litigation. Plaintiff's damage expert estimated that, during the 1980s, plaintiff was shorted thousands of vehicles by defendants, resulting in lost profits of $5 million to $11 million.

Defendants maintained at trial that there was no shortage of Toyota vehicles, and that its allocation system, which defendants referred to as a "balanced day supply" system, was clear and fair. Under a "balanced

day supply" system, allocations are made based on a dealer's past sales performance, rate of sales, and remaining inventory. Each dealer is allocated a "days supply" of vehicles, *i.e.*, that number of vehicles needed so that all dealers, theoretically, exhaust their inventory on the same day. Defendants also maintained that, unlike the domestic automobile manufacturers, they never used a custom order system. Defendants also asserted that plaintiff, by its conduct, waived any claims against defendants; plaintiff's claims were barred by its own breach of the dealer agreements; and pursuant to the parties' course of performance, defendants' conduct did not constitute a breach of the dealer agreements.

After a two-week trial, which included testimony from 30 witnesses, the jury entered a verdict in favor of plaintiff, awarding damages of $2.5 million on plaintiff's breach of contract count, and $2.25 million on plaintiff's count under the Act. The trial court denied defendants' post-trial motion. Based on the jury's special finding that defendants' conduct was willful or wanton, the trial court granted plaintiff's motion for treble damages under the Act and entered judgment on that count in the amount of $6.75 million. See 815 ILCS 710/13 (West 2000) ("Where the misconduct is willful or wanton, the court may award treble damages"). The trial court also ruled that "judgment on Count I [breach of contract] shall be deemed satisfied upon payment of an amount on Count II [violation of the Act] which is equivalent to the judgment on Count I plus interest." Finally, the trial court reserved ruling on plaintiff's motion for attorney fees and costs under the Act (see 815 ILCS 710/13 (West 2000)) and for discovery sanctions, pending appeal, and made a Rule 304(a) finding of appealability (see 155 Ill. 2d R. 304(a)).

The appellate court rejected defendants' numerous claims of error and affirmed the circuit court judgment.

We granted defendants' petition for leave to appeal. 177 Ill. 2d R. 315.

## ANALYSIS

### I. Act's Limitations Period

Defendants first argue that plaintiff's claim under the Act was barred based on the four-year limitations period contained in the statute. 815 ILCS 710/14 (West 2000). Defendants contend that where, as here, a plaintiff's cause of action is purely statutory, and the statute contains its own "built-in" limitations period, compliance with the limitations period is an element of the plaintiff's case and a jurisdictional prerequisite to the plaintiff's right to sue. See *Pasquale v. Speed Products Engineering*, 166 Ill. 2d 337, 366-67 (1995); *Demchuk v. Duplancich*, 92 Ill. 2d 1, 6-7 (1982). Defendants argue that because plaintiff failed to comply with the limitations period set forth in the Act, plaintiff's cause of action under the statute was extinguished.

Plaintiff initially counters that defendants' position before this court is contrary to their position at trial and, therefore, defendants are precluded from making this argument. See *McMath v. Katholi*, 191 Ill. 2d 251, 255 (2000). Plaintiff also asserts that the limitations period contained in section 14 of the Act functions as an ordinary statute of limitations and is not a jurisdictional prerequisite to suit. See *People v. Wright*, 189 Ill. 2d 1, 8-10 (1999).

Ordinarily, principles of waiver do not permit a party to complain of an error where to do so is inconsistent with the party's position taken in an earlier court proceeding. *McMath*, 191 Ill. 2d at 255. Defendants' argument, however, implicates the subject matter jurisdiction of the circuit court. The issue of subject matter jurisdiction cannot be waived. *Currie v. Lao*, 148 Ill. 2d 151, 157 (1992); *People ex rel. Compagnie Nationale Air France v.*

*Giliberto*, 74 Ill. 2d 90, 105 (1978). Therefore, the issue may be raised at any time. *Berg v. Allied Security, Inc.*, 193 Ill. 2d 186, 188 n.1 (2000); *Dubin v. Personnel Board*, 128 Ill. 2d 490, 496 (1989). Moreover, this court has an obligation to take notice of matters which go to the jurisdiction of the circuit court in the case then before us. *Eastern v. Canty*, 75 Ill. 2d 566, 570 (1979); see *In re Estate of Gebis*, 186 Ill. 2d 188, 192 (1999). Accordingly, we will consider the issue of whether the limitations provision of the Act was an element of plaintiff's case and a jurisdictional prerequisite to suit.

Simply stated, "subject matter jurisdiction" refers to the power of a court to hear and determine cases of the general class to which the proceeding in question belongs. *People v. Western Tire Auto Stores, Inc.*, 32 Ill. 2d 527, 530 (1965); *Van Dam v. Van Dam*, 21 Ill. 2d 212, 216 (1961); 14 Ill. L. & Prac. *Courts* § 16, at 183 (1968); see also *Faris v. Faris*, 35 Ill. 2d 305, 309 (1966); Restatement (Second) of Judgments § 11 (1982). With the exception of the circuit court's power to review administrative action, which is conferred by statute, a circuit court's subject matter jurisdiction is conferred entirely by our state constitution. Ill. Const. 1970, art. VI, § 9; *In re Lawrence M.*, 172 Ill. 2d 523, 529 (1996); *In re M.M.*, 156 Ill. 2d 53, 65 (1993). Under section 9 of article VI, that jurisdiction extends to all "justiciable matters." Ill. Const. 1970, art. VI, § 9. Thus, in order to invoke the subject matter jurisdiction of the circuit court, a plaintiff's case, as framed by the complaint or petition, must present a justiciable matter. See *People ex rel. Scott v. Janson*, 57 Ill. 2d 451, 459 (1974) (if a complaint states a case belonging to a general class over which the authority of the court extends, subject matter jurisdiction attaches); *Western Tire*, 32 Ill. 2d at 530 (the test of the presence of subject matter jurisdiction is found in the nature of the case as made by the complaint and the

relief sought); *Ligon v. Williams*, 264 Ill. App. 3d 701, 707 (1994) (court's authority to exercise its jurisdiction and resolve a justiciable question is invoked through the filing of a complaint or petition).

Our current constitution does not define the term "justiciable matters," nor did our former constitution, in which this term first appeared. See Ill. Const. 1970, art. VI, § 9; Ill. Const. 1870, art. VI, § 9 (amended 1964). Generally, a "justiciable matter" is a controversy appropriate for review by the court, in that it is definite and concrete, as opposed to hypothetical or moot, touching upon the legal relations of parties having adverse legal interests. See *Exchange National Bank of Chicago v. County of Cook*, 6 Ill. 2d 419, 422 (1955); *Health Cost Controls v. Sevilla*, 307 Ill. App. 3d 582, 587 (1999); *City of Chicago v. Chicago Board of Education*, 277 Ill. App. 3d 250, 261 (1995). The legislature may create new justiciable matters by enacting legislation that creates rights and duties that have no counterpart at common law or in equity. *M.M.*, 156 Ill. 2d at 65. Through the legislature's adoption of the Act in 1979, the legislature created a new justiciable matter. The legislature's creation of a new justiciable matter, however, does not mean that the legislature thereby confers jurisdiction on the circuit court. Article VI is clear that, *except in the area of administrative review*, the jurisdiction of the circuit court flows from the constitution. Ill. Const. 1970, art. VI, § 9. The General Assembly, of course, has no power to enact legislation that would contravene article VI. See *Tully v. Edgar*, 171 Ill. 2d 297, 308 (1996).

Some case law, however, suggests that the legislature, in defining a justiciable matter, may impose "conditions precedent" to the court's exercise of jurisdiction that cannot be waived. *E.g.*, *In re Marriage of Fields*, 288 Ill. App. 3d 1053, 1057 (1997); *People ex rel. Brzica v. Village of Lake Barrington*, 268 Ill. App. 3d 420, 422-23 (1994);

*In re Estate of Mears*, 110 Ill. App. 3d 1133, 1138 (1982). We necessarily reject this view because it is contrary to article VI. Characterizing the requirements of a statutory cause of action as nonwaivable conditions precedent to a court's exercise of jurisdiction is merely another way of saying that the circuit court may only exercise that jurisdiction which the legislature allows. We reiterate, however, that the jurisdiction of the circuit court is conferred by the constitution, not the legislature. Only in the area of administrative review is the court's power to adjudicate controlled by the legislature. Ill. Const. 1970, art. VI, § 9; *Lawrence M.*, 172 Ill. 2d at 529; *M.M.*, 156 Ill. 2d at 65; see also *In re Custody of Sexton*, 84 Ill. 2d 312, 319-21 (1981) (holding that statutory affidavit provision, although mandatory, was not "jurisdictional" in the sense that it could not be waived).

The legislature's limited role, under our current constitution, in defining the jurisdiction of the circuit court stands in stark contrast to the significant role previously exercised by the legislature under our former constitution. See *Mears*, 110 Ill. App. 3d at 1134-38 (tracing the development of jurisdiction from a purely legislative concept embodied in the 1818 constitution, to the concept now in force under the 1970 constitution). Under our former constitution, adopted in 1870, the circuit court enjoyed "original jurisdiction of all causes in law and equity." Ill. Const. 1870, art. VI, § 12. The court's jurisdiction over special statutory proceedings, *i.e.*, matters which had no roots at common law or in equity, derived from the legislature. See *People v. Graw*, 363 Ill. 205, 208 (1936) (circuit court's constitutionally derived jurisdiction did not apply to special statutory proceedings); *Selden v. Illinois Trust & Savings Bank*, 239 Ill. 67, 74 (1909) (court of general jurisdiction may have a special statutory jurisdiction conferred upon it). Thus, in cases involving purely statutory causes of action, we held that

unless the statutory requirements were satisfied, a court lacked jurisdiction to grant the relief requested. See, *e.g.*, *Martin v. Schillo*, 389 Ill. 607, 609-10 (1945); *People ex rel. Kilduff v. Brewer*, 328 Ill. 472, 479-84 (1927); *Sharp v. Sharp*, 213 Ill. 332, 334-36 (1904).

In 1964, however, amendments to the judicial article of the 1870 constitution became effective. These amendments radically changed the legislature's role in determining the jurisdiction of the circuit court. See *M.M.*, 156 Ill. 2d at 74 (Miller, C.J., concurring, joined by Bilandic, J.) (the sources and scope of the circuit court's jurisdiction changed "dramatically" with the 1964 amendments to the judicial article); *Mears*, 110 Ill. App. 3d at 1137 (a "revolution" was wrought by the 1964 amendments to the juridical article); see also *Steinbrecher v. Steinbrecher*, 197 Ill. 2d 514, 529-30 (2001) (discussing the change, under the 1964 amendments, from courts of limited jurisdiction to courts of general jurisdiction in a single integrated system). Under the new judicial article, the circuit court enjoyed "original jurisdiction of all justiciable matters, and such powers of review of administrative action as may be provided by law." Ill. Const. 1870, art. VI, § 9 (amended 1964). Thus, the legislature's power to define the circuit court's jurisdiction was expressly limited to the area of administrative review. The current Illinois constitution, adopted in 1970, retained this limitation. See Ill. Const. 1970, art. VI, § 9.

In light of these changes, the precedential value of case law which examines a court's jurisdiction under the pre-1964 judicial system is necessarily limited to the constitutional context in which those cases arose. See *M.M.*, 156 Ill. 2d at 74 (Miller, C.J., concurring, joined by Bilandic, J.) ("terminology employed in earlier [pre-1964] decisions must be viewed in the constitutional context in which those cases were decided"); *People v. Valdez*, 79 Ill. 2d 74, 84-85 (1980) (rationale of cases decided under

1870 constitution not applicable in determining whether circuit court had jurisdiction under 1970 constitution). Nonetheless, pre-1964 rules of law continue to be cited by Illinois courts, without qualification, creating confusion and imprecision in the case law.

Defendants in the present case rely on a rule of law that has its roots in the pre-1964 judicial system. Under this rule, as presently articulated by this court, a limitations period contained in a statute that creates a substantive right unknown to the common law, and in which time is made an inherent element of the right, is more than an ordinary statute of limitations; it is a condition of the liability itself and goes to the subject matter jurisdiction of the court. See *Wright*, 189 Ill. 2d at 7-9; *Pasquale*, 166 Ill. 2d at 366-67, citing *Fredman Brothers Furniture Co. v. Department of Revenue*, 109 Ill. 2d 202 (1985); see also *Demchuk*, 92 Ill. 2d at 6-7; *Wilson v. Tromly*, 404 Ill. 307, 310-11 (1949); *Smith v. Toman*, 368 Ill. 414, 418-20 (1938); *North Side Sash & Door Co. v. Hecht*, 295 Ill. 515, 519-20 (1920); *Hartray v. Chicago Rys. Co.*, 290 Ill. 85, 86-87 (1919). This rule of law may have been appropriate under the pre-1964 judicial system when the court's jurisdiction to hear and determine purely statutory causes of action was conferred and limited by the legislature, and the failure to conform strictly to the statutory requirements prevented the court from acquiring subject matter jurisdiction. To the extent this proposition has any relevance today, it is confined to the area of administrative review—the only area in which the legislature still determines the extent of the circuit court's jurisdiction. This principle is illustrated in this court's decision in *Fredman Brothers*.

*Fredman Brothers* arose under our administrative review law. At issue was whether the 35-day period for filing an administrative appeal was jurisdictional. See Ill. Rev. Stat. 1983, ch. 110, par. 3—103. We recognized a

distinction between ordinary statutes of limitations and statutes which both confer jurisdiction and fix a time within which such jurisdiction may be exercised. *Fredman Brothers*, 109 Ill. 2d at 209. We noted that where the court is in the exercise of special statutory jurisdiction, "if the mode of procedure prescribed by statute is not strictly pursued, no jurisdiction is conferred on the circuit court." *Fredman Brothers*, 109 Ill. 2d at 210. Because the circuit court was exercising special statutory jurisdiction under the administrative review law, we concluded that the filing period was jurisdictional and that judicial review of the administrative decision was barred if the complaint was not filed within the time specified. *Fredman Brothers*, 109 Ill. 2d at 211.

*Fredman Brothers* also referenced the early rule that " 'statutes which create a substantive right unknown to the common law and in which time is made an inherent element of the right so created, are not statutes of limitation.' " *Fredman Brothers*, 109 Ill. 2d at 209, quoting *Smith*, 368 Ill. at 420. Such statutes, according to the opinion, "set forth the requirements for bringing the right to seek a remedy into existence," and are "jurisdictional, not mandatory." *Fredman Brothers*, 109 Ill. 2d at 210. Plainly, *Fredman Brothers'* reference to the early rule regarding statutory causes of action was not necessary to decide the case. To the extent, however, that *Fredman Brothers* suggests that such rule still has vitality today, it is limited to the area of administrative review, the context in which *Fredman Brothers* was decided and the only context, under our current constitution, that such rule could apply. We observe, however, that Illinois courts, in numerous cases outside the administrative review area, have incorrectly cited *Fredman Brothers* as authority for the proposition that a limitations period contained in a statutory cause of action is jurisdictional. See, *e.g.*, *Wright*, 189 Ill. 2d at 7-9 (Post-Conviction Hear-

ing Act); *Pasquale*, 166 Ill. 2d at 366-67 (Wrongful Death Act); *Denault v. Cote*, 319 Ill. App. 3d 886, 889 (2001) (Residential Real Property Disclosure Act); *In re Estate of Goodlett*, 225 Ill. App. 3d 581, 589 (1992) (Probate Act); *People v. Ross*, 191 Ill. App. 3d 1046, 1053 (1989) (section 2—1401 of the Code of Civil Procedure); *Bradford v. Soto*, 159 Ill. App. 3d 668, 674-75 (1987) (Dramshop Act); see also *JoJan Corp. v. Brent*, 307 Ill. App. 3d 496, 507 n.4 (1999) (citing *Pasquale* for the proposition that the time limitation in the Mechanics Lien Act is a prerequisite to the court's exercise of jurisdiction). Without calling into doubt the outcomes reached in these cases, we emphasize that the rule set forth in *Fredman Brothers* and earlier case law, under which time limitations in statutory actions are deemed jurisdictional, is not a rule of general applicability to all statutory causes of action. Rather, the rule is limited by the constitutional context in which it first arose.

In contrast to *Fredman Brothers*, the present litigation did not arise under our administrative review law. The circuit court, therefore, was not exercising special statutory jurisdiction. Rather, the circuit court had jurisdiction to hear and determine plaintiff's claim because it was among the general class of cases—those presenting a claim under the Act, a justiciable matter—to which the court's constitutionally granted original jurisdiction extends. Even if plaintiff's complaint defectively stated its claim under the Act, the circuit court would not have been deprived of subject matter jurisdiction. Subject matter jurisdiction does not depend upon the legal sufficiency of the pleadings. *Scott*, 57 Ill. 2d at 459; *Western Tire*, 32 Ill. 2d at 530; 14 Ill. L. & Prac. Courts § 28, at 201-21 (1968); see also *DeLuna v. Treister*, 185 Ill. 2d 565, 579 (1999) (technical pleading requirements are not jurisdictional). Similarly, subject matter jurisdiction does not depend upon the ultimate outcome

of the suit. A party may bring unsuccessful as well as successful suits in the circuit court. Based on the foregoing, we conclude that the limitations period contained in the Act is not a jurisdictional prerequisite to suit.

Our conclusion, while firmly rooted in our constitution, is also consistent with the trend of modern authority favoring finality of judgments over alleged defects in validity. See *In re Marriage of Mitchell*, 181 Ill. 2d 169, 175-77 (1998), citing Restatement (Second) of Judgments § 12 (1982); see also *Fields*, 288 Ill. App. 3d at 1060, citing Restatement (Second) of Judgments § 12 (1982). Labeling the requirements contained in statutory causes of action "jurisdictional" would permit an unwarranted and dangerous expansion of the situations where a final judgment may be set aside on a collateral attack. See 3 R. Michael, Illinois Practice § 2.3, at 21 n.39 (1989). Even if the statutory requirement is considered a nonwaivable condition, the same concern over the finality of judgments arises. Once a statutory requirement is deemed "nonwaivable," it is on equal footing with the only other nonwaivable conditions that would cause a judgment to be void, and thus subject to collateral attack—a lack of subject matter jurisdiction, or a lack of personal jurisdiction. See *Mitchell*, 188 Ill. 2d at 174. As our appellate court has observed, "[b]ecause of the disastrous consequences which follow when orders and judgments are allowed to be collaterally attacked, orders should be characterized as void only when no other alternative is possible." *In re Marriage of Vernon*, 253 Ill. App. 3d 783, 788 (1993); see also *Mitchell*, 181 Ill. 2d at 177 (recognizing that numerous child support orders could be subject to collateral attack if the subject order were found void based on trial court's failure to strictly follow the statute). Our concern regarding the finality of judgments is all the more acute given the plethora of justiciable matters created by our legislature.

Having rejected defendants' argument that the limitations period in the Act is a jurisdictional prerequisite to suit, we next examine defendants' related argument that the limitations period is an element of plaintiff's claim, which plaintiff must plead and prove (see *Hamilton v. Chrysler Corp.*, 281 Ill. App. 3d 284, 287 (1996)), rather than an ordinary limitations period, which provides a technical defense to the claim (see *Sundance Homes, Inc. v. County of Du Page*, 195 Ill. 2d 257, 267-68 (2001); *Hartray*, 290 Ill. at 87). Our determination of this issue is a matter of statutory construction. "[T]he judicial role in construing statutes is to ascertain legislative intent and give it effect. To aid in accomplishing this, a court will seek to determine the objective the legislature sought to accomplish and the evils it desired to remedy." *People v. Scharlau*, 141 Ill. 2d 180, 192 (1990); see also *West American Insurance Co. v. Sal E. Lobianco & Son Co.*, 69 Ill. 2d 126, 129 (1977) (statutes of limitations, like other statutes, must be construed in light of their objectives, quoting *Geneva Construction Co. v. Martin Transfer & Storage Co.*, 4 Ill. 2d 273, 289 (1954)). Because the language of a statute is the best evidence of legislative intent (*In re D.L.*, 191 Ill. 2d 1, 9 (2000)), our inquiry begins with the language of the Act.

The Act regulates motor vehicle manufacturers, distributors, wholesalers and dealers doing business in this State. 815 ILCS 710/1.1 (West 2000). In pertinent part, the Act defines and declares unlawful certain "unfair methods of competition and unfair and deceptive acts or practices." 815 ILCS 710/4 (West 2000). Among those practices declared unlawful is any action by a manufacturer, wholesaler, distributor or dealer, with respect to a franchise, which is "arbitrary, in bad faith or unconscionable and which causes damage to any of the parties or to the public." 815 ILCS 710/4(b) (West 2000). The Act also makes it unlawful for a manufacturer,

wholesaler, or distributor "to adopt, change, establish or implement a plan or system for the allocation and distribution of new motor vehicles to motor vehicle dealers which is arbitrary or capricious or to modify an existing plan so as to cause the same to be arbitrary or capricious." 815 ILCS 710/4(d)(1) (West 2000). Significantly, section 13 of the Act provides that a franchisee or motor vehicle dealer "who suffers any loss of money or property" as a result of the employment by a manufacturer, wholesaler or distributor "of an unfair method of competition or an unfair or deceptive act or practice declared unlawful" by the Act, "may bring an action for damages and equitable relief, including injunctive relief." 815 ILCS 710/13 (West 2000).

Section 14 of the Act sets forth the limitations period applicable to actions for damages and equitable relief:

"§ 14. Limitations. Except as provided in Section 12,[1] actions arising out of any provision of this Act shall be commenced within 4 years next after the cause of action accrues; provided, however, that if a person liable hereunder conceals the cause of action from the knowledge of the person entitled to bring it, the period prior to the discovery of his cause of action by the person entitled shall be excluded in determining the time limited for the commencement of the action. If a cause of action accrues during the pendency of any civil, criminal or administrative proceeding against a person brought by the United States, or any of its agencies under the antitrust laws, the Federal Trade Commission Act [15 U.S.C. § 41 *et seq.* (2000)], or any other federal act, or the laws or to franchising, such actions may be commenced within one year after the final disposition of such civil, criminal or administrative proceeding." 815 ILCS 710/14 (West 2000).

Section 14 does not expressly state an intent by the legislature that the limitations provision be treated as an

---

[1]Section 12 provides, *inter alia*, that certain disputes may be submitted to arbitration. 815 ILCS 710/12 (West 2000). The provisions of section 12 are not at issue in this appeal.

element of a plaintiff's cause of action. In addition, section 14 provides that actions arising out of any provision of the Act "shall be commenced within 4 years next *after the cause of action accrues.*" (Emphasis added.) 815 ILCS 710/14 (West 2000). Such accrual language is typical of ordinary statutes of limitations. See *Fredman Brothers,* 109 Ill. 2d at 209-10. Moreover, section 14 provides for tolling of the limitations period where the person liable under the Act "conceals the cause of action from the knowledge of the person entitled to bring it." 815 ILCS 710/14 (West 2000). The doctrine of equitable estoppel is also typically associated with ordinary statutes of limitations. See generally *Jackson Jordan, Inc. v. Leydig, Voit & Mayer,* 158 Ill. 2d 240, 251-52 (1994); *Hagney v. Lopeman,* 147 Ill. 2d 458, 462-66 (1992) (discussing concealment of cause of action sufficient to toll statute of limitations); *Goodlett,* 225 Ill. App. 3d at 590 (recognizing that concepts of equitable estoppel, tolling and waiver usually apply to statutes of limitations). Thus, the language of section 14 militates in favor of its treatment as an ordinary limitations period.

Such treatment comports with the purpose of the Act. In general terms, the Act is intended "to promote the public interest and welfare," "to prevent frauds, impositions and other abuses upon its citizens, to protect and preserve the investments and properties of the citizens of this State, and to provide adequate and sufficient service to consumers generally," through regulation of motor vehicle manufacturers, distributors, wholesalers and dealers. 815 ILCS 710/1.1 (West 2000). More particularly, section 13 of the Act is intended to protect motor vehicle dealers and franchisees from unfair and deceptive acts and practices employed by manufacturers, wholesalers, or distributors by creating a private right of action. 815 ILCS 710/13 (West 2000). Construction of section 14 as an ordinary statute of limitations,

which provides a technical defense which may be waived, better facilitates this purpose. See *Knauz Continental Autos, Inc. v. Land Rover North America, Inc.*, 842 F. Supp. 1034, 1037 (N.D. Ill. 1993) (the Act must be liberally construed to honor the General Assembly's intent to protect automobile dealers). Accordingly, we reject defendants' argument that compliance with section 14 was an element of plaintiff's claim.

## II. Continuing Violation Rule

Defendants argue, in the alternative, that even if the limitations provision in the Act is not a jurisdictional prerequisite to suit, plaintiff's claim under the Act was time-barred. Underlying defendants' argument is their contention that the so-called "continuing violation rule" was erroneously applied to toll the running of the four-year limitations period.

Under the "continuing violation rule," embraced by our appellate court, where a tort involves a continuing or repeated injury, the limitations period does not begin to run until the date of the last injury or the date the tortious acts cease. See *Roark v. Macoupin Creek Drainage District*, 316 Ill. App. 3d 835, 847 (2000); *Bank of Ravenswood v. City of Chicago*, 307 Ill. App. 3d 161, 167-68 (1999); *Hyon Waste Management Services, Inc. v. City of Chicago*, 214 Ill. App. 3d 757, 763 (1991); *City of Rock Falls v. Chicago Title & Trust Co.*, 13 Ill. App. 3d 359, 364 (1973). The trial court found that plaintiff had alleged a continuing course of conduct and, therefore, that the applicable limitations period would run from the date defendants' wrongful conduct ceased. Relying on this court's decision in *Cunningham v. Huffman*, 154 Ill. 2d 398 (1993), the appellate court affirmed. 316 Ill. App. 3d at 243-44. Whether the limitations period set forth in the Act is subject to tolling under a "continuing violation" rule is a question of law which we review *de novo*. See *Woods v. Cole*, 181 Ill. 2d 512, 516 (1998).

In *Cunningham*, we held that a medical malpractice claim is not barred by the statute of repose where plaintiff demonstrates that there was a continuous and unbroken course of negligent treatment, and that the treatment was so related as to constitute one continuing wrong. *Cunningham*, 154 Ill. 2d at 406. The statute of repose provided that no action could be brought "more than 4 years after the date on which occurred the act or omission or occurrence alleged in such action to have been the cause of such injury or death." Ill. Rev. Stat. 1989, ch. 110, par. 13—212(a). We found it improbable that the legislature intended the word "occurrence," as used in the statute of repose, to be limited to a single event, in light of the unjust results that could follow from such a narrow construction.

> "[I]f the word occurrence were interpreted to mean a single isolated event, patients who discovered that they were gravely injured due to negligent or unnecessary exposure to X-ray radiation or administration of medication over a span of years might be able to recover little, if any, in the way of damages. This would be so because a single dosage of radiation or medicine might be harmless, whereas treatment over time might be either disabling or even fatal. \*\*\* If the statute of repose were read to start on day one of the treatment in a span covering many years, a plaintiff could only seek recovery for the final four years. It is conceivable that the damage caused in the last four years might be either negligible or a small fraction of the harm caused over the continuum of negligence; thus, the recovery of damages would be negligible compared to the actual injury. Surely, the law could not contemplate such an unjust result." *Cunningham*, 154 Ill. 2d at 405-06.

In the present case, the appellate court determined that the *Cunningham* analysis also applied to plaintiff's statutory claim. According to the appellate court, cumulative medical negligence that, over time, results in injury that might otherwise be insignificant, is not unlike defendants' willful and wanton violation of the Act that,

over a period of years, results in a loss to plaintiff that at some point becomes intolerable. 316 Ill. App. 3d at 243-44. The appellate court concluded that because defendants' conduct was of a continuing nature, the limitations period was tolled, and plaintiff's claim was timely. 316 Ill. App. 3d at 244. We cannot agree.

The *Cunningham* opinion did not adopt a continuing violation rule of general applicability in all tort cases or, as here, cases involving a statutory cause of action. Rather, the result in *Cunningham* was based on interpretation of the language contained in the medical malpractice statute of repose. In the present case, plaintiff has not identified any language in the Act which would require a similar result. Moreover, we discern no "unjust results" in the present case, like those we sought to avoid in *Cunningham*, which would militate in favor of applying a continuing violation rule.

In addition, defendants maintain that the continuing violation rule, as applied by the appellate court, is inconsistent with our discovery rule. Generally, under the discovery rule, a cause of action accrues, and the limitations period begins to run, when the party seeking relief knows or reasonably should know of an injury and that it was wrongfully caused. *Clay v. Kuhl*, 189 Ill. 2d 603, 608 (2000); *Knox College v. Celotex Corp.*, 88 Ill. 2d 407, 415 (1981). The Act provides that the four-year limitations period begins to run "after the cause of action accrues." 815 ILCS 710/14 (West 2000).

In its second amended complaint, plaintiff alleged that defendants concealed their wrongful conduct and it was not until the fall of 1990 that plaintiff "discover[ed] its entitlement" to bring a cause of action under the Act.[2] Assuming, *arguendo*, the veracity of this statement, under the discovery rule, the four-year limitations period

[2]The appellate court determined, and we agree, that plaintiff did not pursue his fraudulent concealment theory at trial. 316 Ill.

would have commenced, at the latest, in the fall of 1990. The appellate court, however, determined that, under the continuing violation rule, the limitations period never commenced because defendants' wrongful conduct "never stopped." 316 Ill. App. 3d at 244. Thus, the application of a continuing violation rule in this case tolled the limitations period indefinitely beyond the time that the discovery rule would have permitted. We find it unnecessary, however, to resolve the tension between the discovery rule, on the one hand, and the continuing violation rule adopted by our appellate court, on the other hand, because we conclude that the wrongful conduct at issue in this case did not constitute one continuing violation of the Act.

In its second amended complaint, plaintiff alleged that defendants' allocation of motor vehicles to plaintiff was arbitrary, in bad faith or unconscionable, all in violation of section 4 of the Act. Section 4 of the Act makes its unlawful for defendants to adopt or implement a vehicle allocation system which is arbitrary or capricious (815 ILCS 710/4(d)(1) (West 2000)), or to engage in any action with respect to plaintiff which is arbitrary, in bad faith or unconscionable (815 ILCS 710/4(b) (West 2000)). Although defendants argue that the only conduct at issue is this litigation was the one-time adoption of their vehicle allocation system in the early 1970s, plaintiff's complaint put at issue both the adoption of the system and the individual vehicle allocations under that system. The evidence adduced at trial established that defendants made allocations to plaintiff two to four times per month. Each individual allocation was the result of discrete decisions by defendants regarding the numerous adjustable parameters that drove the computerized allocation system. Although we recognize that the allocations were

---

App. 3d at 244. Thus, plaintiff's "discovery" of defendants' wrongful conduct was not at issue.

repeated, we cannot conclude that defendants' conduct somehow constituted one, continuing, unbroken, decade-long violation of the Act. Rather, each allocation constituted a separate violation of section 4 of the Act, each violation supporting a separate cause of action. Based on the foregoing, we agree with defendants that the appellate court erred in affirming the trial court's application of the so-called continuing violation rule.

We reject, however, defendants' related contention that plaintiff's statutory claim was barred in its entirety. Because each allocation would have supported a separate cause of action, plaintiff may recover damages for the four-year period prior to the filing of its complaint. See *Meyers v. Kissner*, 149 Ill. 2d 1, 10-11 (1992) (continuing private nuisance gave rise over and over again to causes of action, and limitations period merely specified the window in time for which monetary damages may be recovered prior to the filing of the complaint); *Hendrix v. City of Yazoo City*, 911 F.2d 1102, 1103 (5th Cir. 1990) (where initial statutory violation outside the limitations period is repeated later, each violation begins the limitations period anew and recovery may be had for at least those violations that occurred within the limitations period). Plaintiff's second amended complaint, in which plaintiff first alleged a claim under the Act, was filed July 20, 1992. The trial court determined, however, that plaintiff's claim under the Act related back to plaintiff's initial complaint filed August 8, 1989. Defendants have not challenged the trial court's relation-back ruling in this court. Thus, the relevant period for measuring damages under the Act is the four-year period ending August 8, 1989. Before determining whether it is appropriate to remand this matter to the circuit court for a new trial limited to the issue of damages, we consider defendants' other claims of error.

III. Contract Claim Limitations Period

Defendants argue that plaintiff's claim for breach of

the dealer agreements was barred under the four-year statute of limitations contained in article 2 of the Uniform Commercial Code (UCC) (810 ILCS 5/2—725 (West 2000)). The trial court determined that the UCC did not apply, implicitly ruling that the 10-year limitations period for written contracts governed plaintiff's contract claim. See 735 ILCS 5/13—206 (West 2000). This ruling, together with the trial court's determination that the continuing violation rule governed plaintiff's statutory claim, resulted in the two claims being essentially co-extensive. Thus, the appellate court found it unnecessary to address defendants' argument that the contract claim was time-barred. The appellate court explained that because the jury found for plaintiff on both claims, and because the trial court ruled that the award on the breach-of-contract claim could be satisfied by a payment of the award on the statutory claim, it was unnecessary to rule on the statute-of-limitations defense on the breach-of-contract claim. 316 Ill. App. 3d at 242.

As discussed in section II, however, we have rejected application of the continuing violation rule to plaintiff's claim under the Act, and have limited plaintiff's recovery on that claim to the four-year period prior to the filing of the complaint on August 8, 1989. If the 10-year statute of limitations governs plaintiff's contract claim, then the statutory claim and the contract claim are no longer co-extensive, i.e., contract damages would be recoverable for several years in addition to those covered by plaintiff's statutory claim, and payment of the award on the statutory claim would not fully satisfy an award on the contract claim. Therefore, unlike the appellate court, we find it necessary to address defendants' argument and resolve whether plaintiff's contract claim was time-barred. We review this legal issue de novo. See Woods, 181 Ill. 2d at 516.

Plaintiff first alleged a breach of contract in its

amended complaint filed January 30, 1991. The trial court ruled, however, that the contract claim related back to plaintiff's initial complaint filed August 8, 1989. Defendants have not challenged that ruling in this court. Thus, if the four-year UCC limitations period applies, contract claims arising prior to August 8, 1985, would be time-barred.

Plaintiff's contract claim involved four successive dealer agreements, executed in 1980, 1986, 1987, and 1988. It is apparent that claims arising under the 1986, 1987, and 1988 agreements would not be barred by a four-year limitations period, *i.e.*, claims under those three agreements could not have arisen prior to August 8, 1985, because the agreements were not executed and did not become effective until after that date. Only claims arising under the 1980 dealer agreement could be barred by a four-year limitations period. Thus, we confine our review to the 1980 agreement.

The 1980 agreement contained a choice of law provision stating that California law governs.[3] Generally, choice of law provisions will be honored. *Hofeld v. Nationwide Life Insurance Co.*, 59 Ill. 2d 522, 528-29 (1975); see also *Hartford v. Burns International Security Services, Inc.*, 172 Ill. App. 3d 184, 187 (1988). As to procedural matters, however, the law of the forum controls. *Marchlik v. Coronet Insurance Co.*, 40 Ill. 2d 327, 329-30 (1968); see also *Cox v. Kaufman*, 212 Ill. App. 3d 1056, 1062 (1991). Statutes of limitations are procedural, merely fixing the time in which the remedy for a wrong may be sought, and do not alter substantive rights. *Fredman Brothers*, 109 Ill. 2d at 209; see also *Cox*, 212 Ill. App. 3d at 1062. Accordingly, Illinois law governs the

---

[3]The 1986, 1987, and 1988 agreements all provide that the agreement shall be governed by the laws of the state where the dealer is located—Illinois.

timeliness of plaintiff's claim under the 1980 dealer agreement.

The 10-year statute of limitations that generally governs claims on written contracts contains an express exception for actions governed by section 2—725 of the UCC. 735 ILCS 5/13—206 (West 2000). Section 2—725 of the UCC provides that "[a]n action for breach of any contract for sale must be commenced within 4 years after the cause of action has accrued." 810 ILCS 5/2—725(1) (West 2000). "A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." 810 ILCS 5/2—725(2) (West 2000). Only contracts which fall within the scope of article 2 of the UCC are subject to the four-year limitations period. Article 2 is limited to "transactions in goods." 810 ILCS 5/2—102 (West 2000). Defendants argue that the 1980 dealer agreement was principally for the sale of goods and that the agreement therefore comes within the ambit of article 2. Plaintiff contends, however, that the dealer agreement is a personal services contract and is not governed by article 2.

Where, as here, a contract provides both for the sale of goods and for the rendition of services, Illinois courts apply the "predominant purpose" test in determining whether the contract falls within article 2 of the UCC. See *Zielinski v. Miller*, 277 Ill. App. 3d 735, 741 (1995); *Tivoli Enterprises, Inc. v. Brunswick Bowling & Billiards Corp.*, 269 Ill. App. 3d 638, 646 (1995); *Yorke v. B.F. Goodrich Co.*, 130 Ill. App. 3d 220, 223 (1985); *Executive Centers of America, Inc. v. Bannon*, 62 Ill. App. 3d 738, 742 (1978); see also Ill. Ann. Stat., ch. 26, § 2—102, Illinois Code Comment, at 45 (Smith-Hurd 1992 Supp.) ("Illinois reviewing courts have taken what may be called a 'dominant purpose' view"). Under this test, if the contract is predominantly for the sale of goods, with services being incidental thereto, the contract will be

governed by article 2. Conversely, if the contract is predominantly for services, with the sale of goods being incidental thereto, the contract will not fall within article 2. See *Zielinski*, 277 Ill. App. 3d at 741; *Tivoli Enterprises*, 269 Ill. App. 3d at 646-47.

Numerous jurisdictions have held that distributor and dealer agreements, including automobile dealer agreements, are predominantly for the sale of goods and are thus governed by the UCC. See *Sally Beauty Co. v. Nexxus Products Co.*, 801 F.2d 1001, 1005-06 (7th Cir. 1986) (collecting cases); *Old Country Toyota Corp. v. Toyota Motor Distributors, Inc.*, 966 F. Supp. 167 (E.D.N.Y. 1997) (holding that Toyota dealer agreement was governed by the UCC); *Paulson, Inc. v. Bromar, Inc.*, 775 F. Supp. 1329, 1333 nn.1 through 16 (D. Haw. 1991) (collecting cases); *Kirby v. Chrysler Corp.*, 554 F. Supp. 743, 749-50 (D. Md. 1982) (collecting cases and holding that direct dealer agreement with Chrysler was governed by UCC).

Significantly, in *Old Country Toyota*, a federal district court analyzed the provisions of a Toyota dealer agreement executed during the 1980s which, if not identical, is strikingly similar to the one at issue here. The federal court concluded that the dealer agreement was predominantly for the sale of goods and was thus governed by article 2. *Old Country Toyota*, 966 F. Supp. at 170. The federal court noted the prominence of the word "sales" in the agreement's title, "Toyota Dealer Sales and Service Agreement," and stated that the "heart" of the agreement concerned the "Sales of Toyota Products to Dealers" (section VI), and "Promoting and Selling Toyota Products" (section X). *Old Country Toyota*, 966 F. Supp. at 169. Most of the agreement, according to the federal court, reflected the intent to secure a continuum of sales—first from Toyota to the dealer, then on to the public—and the fact that the dispute concerned Toyota's

allocation of vehicles to be purchased by the dealer "underscore[d] that intent." *Old Country Toyota*, 966 F. Supp. at 169. The federal court determined that the "unit allocation provision" in the agreement contained the core attributes of a requirements contract (see 810 ILCS 5/2—306 (West 2000)), under which Toyota agreed to supply vehicles to the dealer in the quantities and types ordered, subject to available supply. *Old Country Toyota*, 966 F. Supp. at 169. Finally, the federal court determined that the service and other provisions in the agreement were collateral to the primary purpose of facilitating sales between Toyota and the dealer. The court stated:

> "Other than sales and sales promotions, the Agreement's substantive provisions concern premises maintenance, accounting methods, maintenance of net working capital, service, and display of Toyota marks. The premises maintenance and accounting provisions are housekeeping matters with little bearing on the Court's analysis. The Agreement does not actually address the only substantive matter not related to sales—the maintenance of net working capital—at all; the parties are directed to address that issue in a separate Working Capital Agreement. The trademark provision merely grants Old Country [the dealer] the right to use the Toyota mark, and then only in connection with 'selling' or 'offering for sale' Toyota products. [Citation.] Though the service provisions are substantial, their overarching purpose is to 'protect the interests' [citation] and 'secur[e] and maintain[ ] the goodwill' [citation] of the buying public. Again, this is at bottom the language of sales." *Old Country Toyota*, 966 F. Supp. at 170.

We agree with the analysis of the federal court and similarly conclude that the 1980 dealer agreement at issue in this litigation is governed by article 2 of the UCC. Accordingly, the four-year limitations period set forth in section 2—725 applies to plaintiff's contract claim.

In an attempt to avoid the effect of a four-year limitations period, plaintiff argues that defendants' wrongful allocations under the 1980 agreement should be considered one breach that did not become actionable until the

contract expired in 1986. In effect, plaintiff advocates the application of a "continuous breach" rule, not unlike the "continuing violation" rule on which it also relied. The only authority cited by plaintiff is *Berg & Associates, Inc. v. Nelsen Steel & Wire Co.*, 221 Ill. App. 3d 526, 532 (1991). *Berg*, however, stands only for the proposition that construction contracts are typically considered a "single endeavor" and that the statute of limitations for claims under the contract does not begin to run until the endeavor is complete, rather than on the date the monetary installments are due on the contract. *Berg*, 221 Ill. App. 3d at 532. The instant case does not involve a construction contract.

Based on the foregoing, we conclude that any breach of the 1980 agreement occurring outside the four-year UCC limitations period was time-barred, and the trial court erred by permitting evidence of claims outside the four-year period.

### IV. Denial of Summary Judgment

We next consider defendants' contention that the trial court erred in denying their motion for summary judgment based on a mutual release of liability provision contained in the 1986, 1987 and 1988 dealer agreements. The appellate court determined that the release issue involved a factual dispute and that the trial court's denial of summary judgment merged with the judgment order and was not appealable. 316 Ill. App. 3d at 234.

As a general rule, when a motion for summary judgment is denied and the case proceeds to trial, the denial of summary judgment is not reviewable on appeal because the result of any error is merged into the judgment entered at trial. See *Labate v. Data Forms, Inc.*, 288 Ill. App. 3d 738, 740 (1997); *People v. Strasbaugh*, 194 Ill. App. 3d 1012, 1016 (1990); *Gaskin v. Goldwasser*, 166 Ill. App. 3d 996, 1013 (1988). The rationale for this rule is that review of the denial order would be unjust to

the prevailing party, who obtained a judgment after a more complete presentation of the evidence. *Strasbaugh*, 194 Ill. App. 3d at 1016-17, quoting *In re Marriage of Adams*, 174 Ill. App. 3d 595, 607 (1988). Defendants contend, however, that their summary judgment motion presented a legal issue for determination by the court, rather than a factual issue for determination by the jury, and that under these circumstances, review of the denial of summary judgment is appropriate. See *Battles v. La Salle National Bank*, 240 Ill. App. 3d 550, 558 (1992).

In their summary judgment motion, defendants argued that plaintiff had released defendants from all claims pursuant to section XXIII of the 1986, 1987 and 1988 dealer agreements. Section XXIII provides that the parties release each other "from any and all claims, causes of action or otherwise that it may have against the other for money damages arising from any event occurring prior to the date of execution of th[e] Agreement." Significantly, section XXIII also states that "the release does not extend to claims which either party does not know or reasonably suspect to exist in its favor at the time of execution of th[e] Agreement."

Whether plaintiff knew or should have reasonably suspected that, at the time the dealer agreements were executed, it had a claim against defendants was an issue of fact. Accordingly, any error in the denial of defendants' summary judgment motion was merged into the trial result and is not reviewable on appeal. See *Labate*, 288 Ill. App. 3d at 740; *Strasbaugh*, 194 Ill. App. 3d at 1016; *Gaskin*, 166 Ill. App. 3d at 1013.

## V. Damages

Defendants next argue that plaintiff failed to prove, with a reasonable degree of certainty, that it sustained any financial losses or lost profits due to defendants' conduct and that defendants are entitled to entry of judgment in their favor. Alternatively, defendants argue that

they are entitled to a new trial on damages. Defendants submit several bases for their argument, each of which the appellate court rejected. Before considering defendants' several contentions, we briefly review the testimony of plaintiff's damage experts.

Plaintiff's principal damage expert, Dr. Lyman Ostlund, testified regarding four different damage models. In the first model, Ostlund sought to demonstrate that defendants' vehicle allocation system, which defendants described to plaintiff as a "turn and earn" system, did not in fact function as a "turn and earn" system. According to Ostlund, although defendants' communications to dealers frequently referenced the need to increase their "turnover rate"—a concept imbedded in a "turn and earn" system—there was no relationship between the extent to which a dealer succeeded in having a high average turnover rate and the extent to which the dealer had a strong positive sales trend over time. If the allocation system was functioning as a "turn and earn" system, there would have been a strong statistical relationship between a dealer's turnover rate and sales growth. Based on a 25-dealer sample from the Chicago region, Ostlund saw no relationship between the two variables. Ostlund calculated the number of vehicles plaintiff would have been allocated, if defendants' allocation system had functioned as a "turn and earn" system, and compared that number to plaintiff's actual allocation. The difference, which Ostlund termed "lost units," was then converted into lost profits.

The second damage model was tied to plaintiff's contention that there was a shortage of Toyota vehicles during the 1980s due to import restrictions under the voluntary restraint agreement (VRA). Ostlund agreed that a shortage existed. Where a shortage of vehicles existed, vehicles were to be allocated, under the 1980 agreement, "principally on the basis of sales performance

during the most recent representative period of adequate supply," and under later agreements, in a "fair and equitable manner." Ostlund determined that the "most recent representative period of adequate supply" was the period June 1980—when the 1980 dealer agreement became effective and plaintiff moved into a new facility—. through March 1981—when the VRA became effective. Ostlund determined that during this period plaintiff's sales of 423 units represented 1.14% of Chicago region sales. Assuming plaintiff would have achieved the same 1.14% of Chicago region sales in subsequent years if defendants had allocated an appropriate number of vehicles to plaintiff, Ostlund determined the number of vehicles plaintiff should have been allocated and compared that figure to the actual allocation. The lost units were then converted into lost profits.

The third damage model was described as a "penetration rate" model and was related to plaintiff's contention that it should have been treated comparably to the Toyota dealers in St. Louis, Missouri. Expert witness James Little testified that Toyota dealers in the St. Louis "Metropolitan Statistical Area," which includes Belleville, Illinois, are part of a "geographically integrated market" and that there was no economic or business logic in placing dealers on the Illinois side in a different administrative region than the dealers on the Missouri side. In addition, Ostlund testified that Toyota dealers on the other side of the river in the "St. Louis Metro" area, as defined by Toyota, received a higher level supply of vehicles, resulting in a higher penetration rate within the import vehicle market. According to Ostlund, if more vehicles had been allocated to plaintiff, *i.e.*, if defendant had been treated comparably to the St. Louis dealers, then it is reasonable to assume that the same penetration rate would have occurred in the Belleville market as occurred on average on the Missouri side. In his third

damage model, Ostlund calculated the penetration rate in the "St. Louis Metro" for each of the years in question, and calculated plaintiff's expected allocation of vehicles based on achieving the same penetration rate in the Belleville market. The lost units—the difference between the expected allocation and actual allocation—were then converted into lost profits.

The fourth and final damage model was based on the concept of an order system, which plaintiff contended was the system required under the 1980 dealer agreement, in the event the jury found there was no shortage of Toyota vehicles. Through the fourth damage model, Ostlund calculated the number of vehicles plaintiff would have ordered and sold if an order system had been in place. The lost units were again converted into lost profits.

Under each model, lost profits were calculated by multiplying the number of lost units for each year at issue by the contribution margin per unit. The contribution margin was derived from data contained in plaintiff's financial statements, and represented the difference between the customer price and the dealer price, adjusted for plaintiff's variable and fixed expenses, including sales commissions, delivery expenses, advertising, inventory maintenance, personnel training, freight, supplies, salaries, payroll taxes, employee benefits, rent, utilities, and over two dozen other items. That figure was then adjusted to reflect the extent to which additional profits would have reduced plaintiff's borrowing. The four models resulted in damage calculations ranging from $5,014,201 for the turnover model, to $6,818,506 for the order model. In addition, each damage model contained a separate damage calculation based on the assumption that plaintiff would have reinvested additional profits into the business. Ostlund's reinvestment calculation produced a range of damages significantly higher: $6,327,434 to $11,119,872.

In addition to the expert testimony of Ostlund and Little, computer consultant Robert Benson testified regarding defendants' allocation system. Benson testified that the computer program under which allocations were made was a parameter-based system. He identified 25 parameters which could affect an allocation. Although Benson testified that the system could be used in a discriminatory way, he could not determine whether, in fact, it was used to discriminate against plaintiff. Benson further testified, however, that his inability to determine whether discriminatory use occurred was the result of the lack of an "audit trail." An audit trail would have allowed an allocation result to be traced back. In other words, of the 25 parameters which could be adjusted and manipulated with any allocation, it was impossible to determine how the parameters were set for a particular allocation. Benson opined that, from a resource allocation perspective, it was unusual to have this much ability to manipulate an allocation system and also unusual that no audit trail existed.

The jury awarded plaintiff $2.5 million on its breach of contract claim, and $2.25 million on plaintiff's MVFA count.

Defendants first maintain that plaintiff's experts "admitted" that they could not establish that defendants' conduct caused any damage to plaintiff, and that plaintiff's experts could not quantify the number of vehicles plaintiff allegedly lost as a result of any act or omission by defendants. Thus, defendants argue that plaintiff's evidence of damages was pure speculation. We disagree.

The record does not support defendants' characterization of the testimony of plaintiff's experts. Although computer consultant Benson could not conclude that the allocation program had been used in a discriminatory fashion, the plain thrust of Ostlund's testimony was to the contrary. Further, Ostlund quantified plaintiff's dam-

ages under each of his four damage models, translating lost units into lost profits. That there is some uncertainty as to the accuracy of Ostlund's projections is not fatal to plaintiff's claims.

Lost profits, by their very nature, will always be uncertain to some extent and incapable of calculation with mathematical precision. *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill. 2d 306, 315-16 (1987). For this reason, the law does not require that lost profits be proven with absolute certainty. Rather, the evidence need only afford a reasonable basis for the computation of damages which, with a reasonable of degree of certainty, can be traced to defendant's wrongful conduct. *Midland Hotel*, 118 Ill. 2d at 315-16. Defendants should not be permitted to escape liability entirely because the amount of the damage they have caused is uncertain. To do so would be to immunize defendants from the consequences of their wrongful conduct. See *Vendo Co. v. Stoner*, 58 Ill. 2d 289, 310 (1974).

Defendants also contend that plaintiff's submission of eight different damage awards (two different awards under four different models) demonstrates the speculative nature of plaintiff's damage claim. According to defendants, "[t]here cannot be eight different ways of calculating 'actual' damages for the same injury with reasonable certainty."

We agree that each damage model calculated damages for the same general injury—lost profits due to improper vehicle allocations. Plaintiff, however, presented more than one theory regarding the allocations. Each damage model involved a different theory and, as discussed above, involved a different factual finding by the jury. Thus, the mere fact that eight different potential awards were submitted to the jury does not, under the circumstances of this case, demonstrate that plaintiff's damages were speculative. Rather, we agree with the ap-

pellate court that because different theories were involved, it was appropriate to submit different estimates of damages to the jury. See *Arch of Illinois, Inc. v. S.K. George Painting Contractors, Inc.,* 288 Ill. App. 3d 1080, 1082 (1997) ("The determination of which measure of damages to apply is usually a question for the jury"); *Hills of Palos Condominium Ass'n v. I-Del, Inc.,* 255 Ill. App. 3d 448, 470-71 (1993) ("only the jury could determine which measure of damages to apply because the alternative measure could only be applied after a factual finding ***"); *John Morrell & Co. v. Local Union 304A of the United Food & Commercial Workers,* 913 F.2d 544, 559 (8th Cir. 1990) (trial court did not err in permitting expert to discuss eight damage models producing a range of lost profits from $20 million to $35 million because the expert explained the different assumptions upon which each model was premised).

Defendants also contend that there was no historical basis for certain of Ostlund's assumptions regarding the level of sales plaintiff would have achieved under the different damage models, and that Ostlund's use of similar assumptions has been rejected by another court. See *Thoroughbred Ford, Inc. v. Ford Motor Co.,* 908 S.W.2d 719 (Mo. App. 1995). In *Thoroughbred Ford,* the Missouri Court of Appeals held that the plaintiff dealership failed to prove with reasonable certainty that any damage occurred due to Ford Motor Company's alleged misrepresentations that it would relocate the dealership. In so doing, the court of appeals rejected Ostlund's testimony regarding lost profits at the new location because a Ford dealership had never existed at that location and there was no rational way to estimate anticipated future profits of the hypothetical dealership. *Thoroughbred Ford,* 908 S.W.2d at 735-36. The present case, unlike *Thoroughbred Ford,* does not involve a hypothetical dealership. Further, the record reveals that the as-

sumptions underlying Ostlund's damage models were tested thoroughly on cross-examination, and challenged by defendants' own expert witnesses.

Defendants argue that plaintiff also failed to establish damages with reasonable certainty in that plaintiff failed to consider the numerous intersecting factors that affect the performance of an automobile dealership in general and that affected plaintiff's performance in particular. See *Midland Hotel*, 118 Ill. 2d at 317. Ostlund testified, however, that his turnover model captured the performance of plaintiff, because it reflected what the dealership should have received in terms of vehicle allocations, commensurate with the dealership's actual performance, *i.e.*, its ability to turn the product. Ostlund further testified that plaintiff's actual performance was reflected in the contribution margin which considered what *this* dealer would make, if it sold one more unit, based on how *it* operates. That defendants are not in agreement with Ostlund's conclusions does not persuade us that plaintiff's damage evidence was unduly speculative.

Finally, defendants argue that Ostlund's "reinvestment theory" was a thinly veiled, improper attempt to secure prejudgment interest and inflate its claimed damages. See *Department of Transportation v. New Century Engineering & Development Corp.*, 97 Ill. 2d 343, 353 (1983) ("this court has consistently held that the right to interest must be found in the contract between the parties or in the statute"); *Sterling Freight Lines, Inc. v. Prairie Material Sales, Inc.*, 285 Ill. App. 3d 914, 921 (1996) (plaintiff's attempt to adjust lost profits award by an "inflationary factor" was improper attempt to secure prejudgment interest). Plaintiff does not dispute that it is not entitled to prejudgment interest. Rather, plaintiff maintains that Ostlund merely provided an alternative damage award under each model based on the assump-

tion that, had plaintiff received all the vehicles to which it was entitled, plaintiff would have reinvested any additional profits in the dealership. Ostlund made this assumption, however, despite knowledge that, historically, plaintiff had *not* reinvested all of its profits in the dealership. Further, Ostlund testified that his reinvestment theory took into account "the time value of money" and that he used the bank rate of interest as the projected rate of return. Based on this record, we agree with defendants that Ostlund's alternative damage awards based on his reinvestment theory was prejudgment interest in another guise and should not have been submitted to the jury.

We also agree with the appellate court, however, that any error did not rise to the level of reversible error. "New trials can be ordered only when the evidence improperly admitted appears to have affected the outcome. *** While we would like all trials to be conducted error free, no useful purpose would be served by granting a new trial when the record reveals that the errors did not change the result reached by the jury." *J.L. Simmons Co. ex rel. Hartford Insurance Group v. Firestone Tire & Rubber Co.*, 108 Ill. 2d 106, 115 (1985). Ostlund was asked, on cross-examination, to recalculate the damage awards, but without taking into account reinvestment of profits and other items defendants questioned. The recalculation produced a damage range of $2.1 million to $3.7 million. The jury awards of $2.25 million and $2.5 million are each within that range. Moreover, they do not approach the $6.3 million minimum award under Ostlund's reinvestment theory. Accordingly, we cannot conclude that the improper admission of this evidence affected the outcome of the trial. Even if it could be said that Ostlund's reinvestment theory improperly influenced the jury's damage award, as discussed below, this matter will be remanded to the

circuit court for a new hearing on damages. We are confident that this error—whether harmless or not—will not recur on remand.

## VI. New Hearing on Damages

Having determined that no issue raised by defendants requires reversal of the judgment in its entirety, we return now to the issue of whether it is appropriate to remand this matter for a new trial on damages alone, as defendants suggest. A court may order a new trial solely on the issue of damages "where the damage issue is so separable and distinct from the issue of liability that a trial of it alone may be had without injustice." *Paul Harris Furniture Co. v. Morse*, 10 Ill. 2d 28, 46 (1956); see also *Robbins v. Professional Construction Co.*, 72 Ill. 2d 215, 224 (1978). Notwithstanding some of the complexities of this case, we believe, based on our review of the record, that the issue of damages is severable from the issue of liability. We therefore remand this matter to the circuit court for a new trial solely on the issue of damages. Consistent with our discussion above, any damage award is limited to the four-year period prior to the filing of plaintiff's complaint on August 8, 1989.

## CONCLUSION

For the foregoing reasons, we affirm in part and reverse in part the judgments of the circuit and appellate courts and remand this matter to the circuit court for further proceedings.

> *Judgments affirmed in part and reversed in part; cause remanded with directions.*

JUSTICE FREEMAN, dissenting:

The issue raised in this case is simply a question as to how the limitation period contained in the Motor Vehicle Franchise Act (Franchise Act) (815 ILCS 710/14 (West 1992)) is to be construed. We are asked to determine whether that limitation period may be tolled by continu-

ing acts of capricious allocation or continuing illegal modifications of dealer agreements. The trial judge in this case mistakenly believed that the period could be tolled in that manner. Unfortunately, that erroneous ruling affected, detrimentally, the manner in which the parties tried the case. In light of that fact, I do not believe that defendants have changed their position on appeal, nor do I believe that plaintiff abandoned its fraudulent concealment position. In my view, the errors made by the circuit court necessitate a remand for a new trial in its entirety, and not just for damages, as the court today concludes. I therefore respectfully dissent.

Factual Background

The dispute at issue in this case grew from a single-count complaint for injunctive relief filed by plaintiff against defendants on August 8, 1989. Plaintiff is a Toyota dealership, and defendants are Toyota distributors. Plaintiff sought, pursuant to the Franchise Act, to enjoin defendants from allowing a competing dealership to open in nearby Collinsville.

Plaintiff amended its complaint in January 1991 to include a breach of contract claim for damages in addition to the injunctive relief previously sought. Plaintiff alleged that, on or about February 12, 1975, it entered into a written Toyota "Dealer Sales and Services Agreement" with a predecessor to defendants. According to plaintiff, the 1975 agreement established plaintiff's right to sell and service motor vehicles in addition to related parts and accessories. The agreement also included an allocation provision for the distribution of vehicles to the dealership. At some time during the fall of 1978 or the winter of 1979, defendants came into existence and assumed liability of the predecessor. Plaintiff claimed that from at least January 22, 1979, through June 1, 1986, the dealership agreement between defendants and plaintiff contained the same "unit allocation" provision

as set forth in the 1975 agreement. Plaintiff alleged that defendants breached their agreement with, and their representations and promises to, plaintiff in that they failed to provide and/or allocate Toyota products to plaintiff either in the quantities required under the allocation provision or as defendants orally represented and promised to plaintiff.

After the original count for injunctive relief was voluntarily dismissed with prejudice, defendants moved to dismiss the remaining breach of contract claim, arguing that it was time-barred. Defendants asserted that the action was governed by the Uniform Commercial Code (UCC) (810 ILCS 5/2—725 (West 1992)) because a dealership contract such as the one at issue is a contract for the sale of goods. As such, the four-year statute of limitations contained in the UCC acted to bar the claim.

The circuit court had not ruled on defendants' motion to dismiss before plaintiff filed yet another amended complaint. This complaint contained three counts. The first count was for breach of contract and essentially mirrored the count contained in the first amended complaint. Plaintiff alleged that from January 29, 1979, through June 1, 1986, defendants failed to provide or allocate Toyota products to plaintiff in such quantities as required under the allocation provision of the parties' agreement. Moreover, plaintiff alleged that defendants fraudulently concealed their actions from plaintiff and plaintiff did not discover those actions until approximately the fall of 1990.

In count II, plaintiff alleged that defendants interfered with plaintiff's prospective economic advantage. In count III, plaintiff alleged that defendants violated section 4 of the Franchise Act. According to plaintiff, from January 22, 1979, through June 1, 1986, defendants' allocation of motor vehicles to plaintiff was arbitrary, capricious, in bad faith, and unconscionable, all in violation of

the Franchise Act. In addition, plaintiff alleged that defendants concealed their arbitrary and capricious allocation system from plaintiff's knowledge so that plaintiff was unable to discover its entitlement to bring the cause of action until the fall of 1990.

On the same day that it filed its second amended complaint, plaintiff filed a response to defendants' outstanding motion to dismiss the amended complaint. In that response, plaintiff maintained that the UCC did not apply to its claim of breach of contract. The circuit court eventually ruled as a matter of law that the breach of contract claim was not governed by the UCC; rather, the 10-year statute of limitations was applicable. The circuit court also found that the amended complaint related back to the first complaint filed in August 1989.

Defendants thereafter filed a second motion to dismiss, in which they reiterated their contention that the four-year limitation contained in the UCC applied to the breach of contract claim. Thus, defendants contended that even if the claim did relate back to the filing date of the original complaint (August 8, 1989), plaintiff was foreclosed from asserting breaches that occurred prior to August 8, 1985. In addition, defendants argued that the question of fraudulent concealment was irrelevant because under the UCC, lack of knowledge does not serve to toll the limitation period.

As to count III, which alleged Franchise Act violations, defendants argued that section 14 of the Act contains a four-year limitation period which begins to run after the cause of action accrues. According to count III of the complaint, the last allocation alleged by plaintiff occurred on or before June 1, 1986. Because plaintiff first asserted the claim more than four years after June 1, 1986 (July 20, 1992), the claim was barred in its entirety. Defendants also claimed that plaintiff failed to allege any facts showing fraudulent concealment. For these

reasons, defendants argued that plaintiff was not entitled to relief under the Franchise Act.

In response, plaintiff repeated its contention that the breach of contract claim was governed by the 10-year statute of limitations. As to the Franchise Act violation, plaintiff contended that the claim was not time-barred due to the fact that defendants' conduct consisted of a continuing violation. Plaintiff contended that, under that doctrine, the limitations period began to run upon the cessation of the conduct. As a result, the claim was not time-barred. In the alternative, plaintiff argued that defendants' fraudulent conduct tolled the four-year limitation period because defendants' actions prevented plaintiff from discovering the violations until 1990.

In ruling on the motion, the circuit court first found that all the claims related back to the date the original complaint was filed, August 9, 1989. Moreover, the court found that plaintiff had alleged a continuing course of conduct and as matter of law "any Statute of Limitations period runs from the date of the cessation of said continuous conduct." As a result, the claims were not time-barred. This analysis applied to all claims, including those brought under the Franchise Act.

Analysis

The foregoing procedural history of this dispute reveals that defendants have long maintained that (i) plaintiff's Franchise Act claim is time-barred and (ii) plaintiff's breach of contract claim was governed by the statute of limitations contained in the UCC. These contentions were repeatedly rejected by the trial judge. The record also reveals that plaintiff alleged fraudulent concealment in its complaint and establishes that plaintiff knew of its statutory duty of pleading, at least at one point in the early stages of the litigation. Indeed, the trial judge's ruling that the continuing violation doctrine applied to the violations at issue caused plaintiff to

abandon its effort to show how defendants had fraudulently concealed the violations of the Franchise Act until 1990.

Notwithstanding the above, the court today implies that defendants have changed their position on appeal and thus have waived their argument. See 199 Ill. 2d at 333. I do not believe that defendants' position before this court is contrary to their position at trial. Defendants maintain here, as they did below, that plaintiff brought this action too late to recover statutory damages under the Franchise Act and too late to recover for any alleged breach of the dealership agreements under the UCC. In fact, the court agrees with defendants to an extent, in holding that the trial judge erred in calculating the limitations period in both respects. Thus, there is simply no reason to discuss principles of waiver here nor is there anything about defendants' argument that "implicates the subject matter jurisdiction of the circuit court." 199 Ill. 2d at 333.

We granted leave to appeal in this case in order to decide whether the continuing violation doctrine could be applied to actions brought under the Franchise Act. The question concerns whether the language of section 14 of the Franchise Act is consistent with the policy considerations which underscore the continuing violation doctrine. I believe that the question is a fairly narrow one, the resolution of which does not require the court to expound on the issue of subject matter jurisdiction. In addition to my belief that the court's discussion (see 199 Ill. 2d at 333-41) on jurisdiction is unnecessary, I also believe that it is wrong. The questions regarding jurisdiction were answered in this court's opinion in *In re M.M.*, 156 Ill. 2d 53 (1993). Today's opinion, at the very least, calls into question 30 years of this court's long-standing precedent and, at most, flatly overrules that precedent. This is done despite the fact there is not any discernible

conflict or confusion amongst the lower courts as to this matter nor is there any other reason which would warrant this court to ignore *stare decisis* in the manner that it does. See *Heimgaertner v. Benjamin Electric Manufacturing Co.*, 6 Ill. 2d 152 (1955) (recognizing that doctrine of *stare decisis* may be overturned only by a showing of good cause).

Leaving aside the discussion about jurisdiction, I strongly disagree with the court's holding that the provisions in section 14 of the Franchise Act do not constitute an element of the cause of action to be pled and proved by the plaintiff, but act rather as an "ordinary statute of limitations." 199 Ill. 2d at 344. I remind my colleagues in the majority that this court just recently reaffirmed the notion that the General Assembly is free to impose limitations and conditions on the availability of relief under the statutory causes of actions that it creates. *In re Marriage of Kates*, 198 Ill. 2d 156 (2001). Given that the Franchise Act provides automobile dealerships with a statutory cause of action against arbitrary and unfair allocations made by distributors—a claim unavailable under our common law—it is not unreasonable that the legislature chose to impose time requirements on the availability of this legislatively created relief. See, *e.g.*, *Varelis v. Northwestern Memorial Hospital*, 167 Ill. 2d 449, 454 (1995) (and cases cited therein). The court today appears to take the position that the changes that were wrought by the 1964 amendments to the 1870 Illinois Constitution did away with the legislature's right to impose preconditions to the statutory causes of actions that it creates. I disagree. Those changes did not in any way affect the legislature's power to impose such limits or preconditions. See *M.M.*, 156 Ill. 2d at 75 (Miller, C.J., concurring, joined by Bilandic, J.) We, as the highest court, have no right to transform an element of the plaintiff's case into an affirmative defense to be pled and proved by the defendant.

Notwithstanding this court's long-standing recognition of the legislature's ability to impose limits or preconditions upon the right to relief under a statutory cause of action, I do not believe that the plain language of the Franchise Act, as the court holds, compels the conclusion that the four-year limitation period is an ordinary statute of limitation. The wording of the statute is similar to language found in other legislatively created remedies. See, *e.g.*, 235 ILCS 5/6—21 (West 2000); 740 ILCS 180/2 (West 2000). This court has construed the provisions in these statutes as elements of the plaintiff's case. *Lowrey v. Malkowski*, 20 Ill. 2d 280 (1960); *Wilson v. Tromly*, 404 Ill. 307 (1949). I believe that the same result should obtain here. In addition, statutes of limitations that the legislature intends to be raised as affirmative defenses are ordinarily placed by the General Assembly in the Code of Civil Procedure. See 735 ILCS 5/13—201 *et seq.* (West 2000). Had the legislature intended for section 14 of the Franchise Act to serve as an affirmative defense, it would have added it to the limitations section of the Code of Civil Procedure, particularly in light of the fact that this court has historically given a limitation period contained in a statutory remedy a construction that places the burden on the plaintiff.

Section 14 of the Franchise Act allows an aggrieved party to toll the four-year limitation if it can establish that the alleged violations were concealed from the aggrieved party's knowledge. In this case, plaintiff's complaint alleged such conduct. However, the trial court's ruling that the section 14 limitation period was tolled by the continuing violation doctrine made the fraudulent concealment element of plaintiff's claim irrelevant, and plaintiff, not surprisingly, presented no proof on the subject at trial. Nevertheless, the trial court allowed recovery even though the statute's requirement with respect to concealment was not met. Thus, the question

that must be resolved here is whether the trial court was correct in tolling the four-year limitation period due to the continuing violation doctrine. Defendants claim the court erred because it eliminated the concept of knowledge from the case. Plaintiff, on the other hand, argues that the doctrine is applicable here under the facts of the case.

The General Assembly enacted the Franchise Act in 1979 as part of its police power in order to promote, *inter alia*, service to consumers generally. 815 ILCS 710/1.1 (West 1992). Under section 4(d) of the Franchise Act, a motor vehicle distributor cannot "adopt, change, establish or implement a plan or system for the allocation and distribution of new motor vehicles to motor vehicle dealers which is arbitrary or capricious or *** modify an existing plan so as to cause the same to be arbitrary or capricious." 815 ILCS 710/4(d)(1) (West 1992). Section 14 provides that

> "actions arising out of any provision of this Act shall be commenced within 4 years next after the cause of action accrues; provided, however, that if a person liable hereunder conceals the cause of action from the knowledge of the person entitled to bring it, the period prior to the discovery of his cause of action by the person entitled shall be excluded in determining the time limited for the commencement of the action." 815 ILCS 710/14 (West 1992).

Thus, an aggrieved party has four years after the cause of action accrues to bring suit under the Franchise Act, unless the violation was concealed.

In my view, the statutory language makes clear that knowledge of the violation is essential to the time limitation contained in the Franchise Act. That the sole exception to the four-year limitation period is for concealment underscores the legislature's desire that an action be brought as soon as the person entitled to bring it has knowledge of the violation. An exception based on a theory of continuing violations takes the concept of knowl-

edge out of the equation, as this case aptly demonstrates. "Where the language of a statute is clear and unambiguous, a court must give it effect as written, without 'reading into it exceptions, limitations or conditions that the legislature did not express.' " *Garza v. Navistar International Transportation Corp.*, 172 Ill. 2d 373, 378 (1996), quoting *Solich v. George & Anna Portes Cancer Prevention Center of Chicago, Inc.*, 158 Ill. 2d 76, 83 (1994).

Moreover, had the legislature intended for continuing violations to serve as an exception to the four-year limitation period, it would have explicitly made it a part of the language of section 14. Our General Assembly has provided for such an exception to the limitation periods contained in several statutory causes of action. See, *e.g.*, 225 ILCS 425/9.5 (West 2000) ("[a] continuing violation will be deemed to have occurred on the date when the circumstances first existed which gave rise to the alleged continuing violation"); 225 ILCS 457/120 (West 2000) ("[a] continuing violation will be deemed to have occurred on the date when the circumstances last existed that gave rise to the alleged continuing violation"). The absence of such language in section 14 reflects the General Assembly's specific rejection of the doctrine as a basis for tolling the limitation period in Franchise Act cases. For these reasons, I agree with my colleagues in the majority that the trial court erred in applying the continuing violation doctrine to this case. 199 Ill. 2d at 349. However, I do not agree with their ultimate conclusion regarding the disposition of this case, as I explain below.

As I read the court's opinion, each improper allocation by defendants served as a specific violation of the Franchise Act. See 199 Ill. 2d at 349 (stating that "each allocation constituted a separate violation of section 4 of the Act, [with] each violation supporting a separate cause of action"). If this is so, I am confused by the court's

holding that because "each allocation would have supported a separate cause of action, plaintiff may recover damages for the four-year period prior to the filing of its complaint." 199 Ill. 2d at 349. Specifically, I question why my colleagues are limiting plaintiff's recovery to the four-year period prior to the filing of plaintiff's complaint. If each allocation of Toyota products by defendants constituted a separate violation of the Franchise Act, plaintiff had, under the statute, four years from the date of each improper allocation to bring suit under the Franchise Act, unless it could show fraudulent concealment. Each four-year "clock" began to run on the date of the alleged improper allocations. However, under section 14, each "clock" could be tolled if it could be shown that the person liable for the conduct "conceal[ed] the cause of action from the knowledge of the person entitled to bring it." 815 ILCS 710/14 (West 1992). Plaintiff alleged in its second amended complaint that, from January 29, 1979, through June 1, 1986, defendants' allocation of motor vehicles to plaintiff was arbitrary, capricious, in bad faith, and unconscionable, all in violation of the Franchise Act. In addition, plaintiff alleged that defendants concealed their arbitrary and capricious allocation system from plaintiff's knowledge so that plaintiff was unable to discover its entitlement to bring the cause of action until the fall of 1990. If, as the court holds, each allocation of Toyota's products served to constitute a separate cause of action, i.e., the accrual of a cause of action, then under section 14, plaintiff had four years from the date of each allocation to file suit, unless prevented from doing so by fraudulent concealment. Thus, it is possible that plaintiff can pursue recovery for alleged improper allocations prior to 1985. I fail to see why any potential recovery should be limited to the four-year period prior to the filing of plaintiff's original complaint. The court's remedy here is inconsistent with its

premise that each allocation serves as a separate cause of action.

I believe that the trial judge's erroneous application of the continuing violation doctrine served to complicate this litigation. As noted, plaintiff, in its second amended complaint, alleged that, because of defendants' fraudulent concealment, it did not learn that it was entitled to bring any statutory cause of action until the fall of 1990. After defendants challenged the timeliness of the action, the circuit court ruled that plaintiff's cause of action under the Franchise Act was timely filed as a matter of law. In so ruling, the circuit court applied the continuing violation doctrine to this case with the result being that plaintiff's knowledge of the violations was irrelevant. Thus, plaintiff had no reason to pursue its theory of fraudulent concealment at trial. Therefore, the erroneous ruling, in my view, prevented plaintiff from proving that defendants' fraudulent actions tolled the four-year limitation period for alleged violations preceding 1985. I therefore cannot agree with the court's conclusion that plaintiff "did not pursue" the theory of fraudulent concealment and abandoned it at trial. 199 Ill. 2d at 377 n.2. In the wake of the trial judge's application of the continuing violation doctrine to this case, any pursuit of fraudulent concealment on plaintiff's part was simply unnecessary.

Due to the adverse effects of the trial judge's ruling, defendants were also harmed because they were unable to have the jury determine the question of when, if ever, plaintiff knew of the allegedly improper allocations. My review of the trial testimony reveals that there was some discrepancy as to when plaintiff, through its representatives, knew of the improprieties with respect to the allocations, which presents a question of fact that can only be resolved by the jury. For these reasons, I am of the view that the trial judge's erroneous pretrial rulings had

an adverse effect on the litigation as a whole and that the correct approach here would be to remand the matter so that the case can be retried within the framework of the proper limitations periods. This ensures that both parties are allowed to present their theories of the case to the jury. Parenthetically, I would note that in litigation such as this, an interlocutory appeal might have been of some assistance to both the trial judge and the litigants in preventing the remand ordered today. I note that the record contains an attempt by defendants for Rule 308 certification, a procedure which, had it been allowed, might have lessened the obfuscation which surrounded the construction of the statute of limitations at issue. Suffice it to say, the circuit court's incorrect ruling that the continuing violation rule applied to this case caused much confusion as to proving when precisely these alleged violations occurred. It resulted in an absence of proof concerning plaintiff's knowledge of the alleged violations and defendants' alleged fraudulent concealment of them. This view is only reinforced by this court's holding that the circuit court also erred in finding the four-year UCC statute of limitations inapplicable to this action. 199 Ill. 2d at 355. Time and knowledge were no longer issues in the trial that followed these rulings.

After reviewing the record carefully, I cannot agree that a new trial on damages is all that is necessary to rectify these errors. As Justice Bilandic once noted while a member of our appellate court, "[a]fter a shirt or blouse is incorrectly buttoned, the solution is to unbutton it completely and start all over." *Morrey v. Kinetic Services, Inc.*, 133 Ill. App. 3d 1002, 1005 (1985). The same must be said for the case at bar.

JUSTICE McMORROW joins in this dissent.