CROSSROADS FORD TRUCK SALES, INC., Plaintiff-Appellant, v. STERLING TRUCK CORPORATION, Defendant-Appellee.

Fourth District    No. 4—02—0931

Argued June 18, 2003.—Opinion filed June 30, 2003.—Rehearing denied July 31, 2003.

Gary L. Smith (argued), of Loewenstein, Hagen & Smith, P.C., of Springfield, for appellant.

Michael D. Smith, Jason R. Bent, and Derek L. Wright, all of Foley & Lardner, of Chicago, and Jon P. Christiansen (argued), of Foley & Lardner, of Milwaukee, Wisconsin, for appellee.

Peter J. McNamara, of Illinois Automobile Dealers Association, of Springfield, for amicus curiae.

JUSTICE APPLETON delivered the opinion of the court:

Plaintiff, Crossroads Ford Truck Sales, Inc., has a franchise from defendant, Sterling Truck Corporation, to sell trucks and parts manufactured by defendant. In the franchise agreement (the agreement), plaintiff promises to have an adequate inventory of trucks and parts (by buying the trucks and parts from defendant) and enough technicians and tools to service the trucks. The agreement states that each year, defendant will send plaintiff an "annual operating requirements addendum" "specifying certain operational requirements for [plaintiff's] satisfaction of its commitments in [the] agreement." The agreement requires plaintiff to sign and comply with the annual ad-

denda and states that breach of any provision of the agreement is cause for terminating the franchise.

Plaintiff sought a declaratory judgment that the "HN80 Dealer Annual Operating Requirements Addendum" for 2001 (the 2001 addendum), as well as the requirement that plaintiff sign and comply with future annual operating requirements addenda, violated the Motor Vehicle Franchise Act (Act) (815 ILCS 710/1 through 32 (West 2000)). Plaintiff sought an injunction against any further such violations. The parties filed cross-motions for a judgment on the pleadings. The trial court denied plaintiff's motion and granted defendant's motion.

Plaintiff appeals both rulings, arguing that the addenda are (1) "coercive" or an "attempt to coerce" within the meaning of section 4(c) of the Act (see 815 ILCS 710/4(c) (West 2000)), (2) "unreasonably restrictive" within the meaning of section 7 (815 ILCS 710/7 (West 2000)), (3) "arbitrary" and "unconscionable" within the meaning of section 4(b) (815 ILCS 710/4(b) (West 2000)), and (4) unilateral modifications of the agreement. We hold that the denial of plaintiff's motion for a judgment on the pleadings is an interlocutory order and, therefore, not appealable. See *Fabian v. Norman*, 138 Ill. App. 3d 507, 509, 486 N.E.2d 335, 337-38 (1985). We further hold that the 2001 addendum and the provision for issuing future addenda do not offend the Act. The 2001 addendum is not a unilateral modification; it is actually part of the agreement that plaintiff signed. Plaintiff does not contend that the addenda issued after 2001 are substantively unreasonable. Therefore, we hold that defendant did not unilaterally modify the agreement, and we affirm the trial court's judgment.

## I. BACKGROUND

Plaintiff is a dealer in medium- and heavy-duty trucks. Defendant, formerly known as HN80 Corporation, is a manufacturer of trucks and parts, which it distributes through a network of dealers with whom it has entered into franchise agreements.

In September 2001, the parties executed the agreement, entitled "HN80 Corporation Dealer Sales and Service Agreement." In the agreement, defendant appoints plaintiff as an "independent authorized dealer for HN80 [p]roducts" and gives plaintiff the "right[s] to purchase" defendant's products "for resale" within a specified geographical "[a]rea of [r]esponsibility" and to "display and use" defendant's "trademarks and service marks."

Defendant's responsibilities, under the agreement, are to provide plaintiff "a fair and equitable share of [defendant's] production of HN80 [p]roducts" and to "make available sales and service support

*** in the form of advertising, sales promotion and sales campaign materials, sales and service training programs ***, and service and parts manuals."

Plaintiff's contractual responsibilities fall under three headings:
"A. Sales

[Plaintiff] shall conscientiously and diligently promote the sales of HN80 [p]roducts and obtain and maintain a reasonable share of the market for such products in [plaintiff's] [a]rea of [r]esponsibility. [Plaintiff] shall *** employ adequate, trained, and competent personnel, and maintain a suitable inventory of HN80 [p]roducts as may be necessary to fulfill [plaintiff's] obligations under this [a]greement.

B. Service

[Plaintiff] shall provide in its [a]rea of [r]esponsibility prompt, reliable[,] and effective service to all owners and purchasers of HN80 [p]roducts. *** In accordance with the [defendant's] standards, [plaintiff] shall establish and maintain complete service facilities, including adequate parts inventory, and employ competent, trained personnel as may be necessary to fulfill [plaintiff's] responsibilities under this [a]greement.

C. Dealer Annual Operating Requirements

Without limiting [defendant's] or [plaintiff's] obligations under this [a]greement, [plaintiff] has signed the [']HN80 Dealer Annual Operating Requirements Addendum.['] [Plaintiff] shall sign a revised [']HN80 Dealer Annual Operating Requirements Addendum['] each year. [Plaintiff] agrees to operate its dealership in accordance with and in fulfillment of the requirements of the [']HN80 Dealer Annual Operating Requirements Addendum,['] which specifies certain operational requirements for [plaintiff's] satisfaction of its commitments made in this [a]greement. Failure of [plaintiff] to sign the revised [']Dealer Annual Operating Requirements Addendum['] shall not relieve [plaintiff] of any of its obligations under this [a]greement."

In paragraph VII, entitled "Additional Provisions," the agreement provides:

"[Defendant's] [']Standard Provisions['] for this [']HN80 Dealer Sales and Service Agreement['] *** [and] the [']HN80 Annual Operating Requirements Addendum['] *** are made a part of this [a]greement as though they were fully set forth herein, and any other *** addenda are likewise made a part of this [a]greement when executed ***."

Paragraph X of the "Standard Provisions," entitled "Promotion and Sale of HN80 Products," reiterates plaintiff's commitments to "carry in stock an adequate inventory of unsold new HN80 [v]ehicles"

and "carry an inventory of parts in accordance with [defendant's] minimum inventory requirements." "HN80 [p]roducts" means "HN80 [v]ehicles and [p]arts." "HN80 [v]ehicles" means "the new trucks *** which [defendant], in its sole discretion, offers for sale to [plaintiff]." "Parts" means "parts sold by [defendant]."

In paragraph XIII of the "Standard Provisions," entitled, "Dealership Facilities, Personnel, Locations, and Identification," plaintiff "commits to *** keep competent personnel in sufficient numbers to enable [plaintiff] to meet its *** service and customer satisfaction responsibilities under this [a]greement."

Paragraph XV of the "Standard Provisions," entitled "Termination," specifies the conditions under which defendant may terminate the agreement. With 30 days' written notice, defendant may terminate the agreement because of a "[b]reach or violation by [plaintiff] of any term or provision of this [a]greement." With 120 days' notice, defendant may terminate the agreement because of plaintiff's "fail[ure] to satisfactorily perform its sales and promotion responsibilities[ ] under the provisions of [p]aragraph X."

Paragraph XVIII(E) of the "Standard Provisions," entitled "Sole Agreement and Amendments," provides, in part:

"This [a]greement constitutes the entire agreement between the parties relating to the HN80 sales and service, and no understanding, amendment, modification, alteration[,] or waiver not expressly set forth or provided for in this [a]greement shall be valid unless in each instance such understanding, amendment, alteration, modification, or waiver is expressed in a written instrument executed by the duly authorized officers of [defendant] and [plaintiff], and such instrument specifically refers to this [a]greement and specifically states an intent to amend, alter, or modify this [a]greement."

Robert W. Richards, defendant's director of dealer operations, sent plaintiff the 2001 addendum as an enclosure to a letter dated July 3, 2001. The 2001 addendum required plaintiff to purchase $1,375,000 in parts and maintain an inventory of 15 trucks and $400,000 in parts. It also required plaintiff to have specified tools and "employ a minimum of two service technicians on each shift of operation."

Both the agreement and the 2001 addendum had blank lines for plaintiff's signature. Plaintiff signed the agreement on September 5, 2001, but never signed the 2001 addendum.

After denying plaintiff's motion for a judgment on the pleadings, the trial court granted defendant's cross-motion, for two reasons: (1) the parties' agreement specifically provided that defendant would annually submit to plaintiff an operating requirements addendum, and

(2) the process of submitting such addenda to dealers did not violate Illinois law.

This appeal followed.

## II. ANALYSIS

### A. Standard of Review

■ A trial court should enter a judgment on the pleadings only if the record reveals no genuine issue of material fact and the moving party is entitled to the judgment as a matter of law. *M.A.K. v. Rush-Presbyterian-St. Luke's Medical Center*, 198 Ill. 2d 249, 255, 764 N.E.2d 1, 4 (2001). In ruling on the motion, the trial court should consider only the facts apparent from the face of the pleadings, judicial admissions in the record, and matters of which it may take judicial notice. *M.A.K.*, 198 Ill. 2d at 255, 764 N.E.2d at 4. The trial court must accept as true the well-pleaded facts in the nonmovant's pleadings as well as reasonable inferences from those facts. *XLP Corp. v. County of Lake*, 317 Ill. App. 3d 881, 884-85, 743 N.E.2d 162, 165 (2000). We review the judgment *de novo*, asking whether any genuine issue of material fact exists and, if not, whether the prevailing party is entitled to a judgment as a matter of law. *XLP Corp.*, 317 Ill. App. 3d at 885, 743 N.E.2d at 165-66.

■ We also use a *de novo* standard of review in construing statutes. *In re Marriage of Beyer*, 324 Ill. App. 3d 305, 309, 753 N.E.2d 1032, 1036 (2001).

### B. Coercion

■ In its brief, plaintiff characterizes itself as a "[m]otor vehicle dealer" within the meaning of section 2(h) of the Act (815 ILCS 710/2(h) (West 2000)) and defendant as a "[m]anufacturer" within the meaning of section 2(b) (815 ILCS 710/2(b) (West 2000)). Defendant does not disagree. As a "manufacturer," defendant must conform to sections 4(c)(1) and (c)(3) of the Act, which provide:

"It shall be deemed a violation for a manufacturer *** to *coerce*, or *attempt to coerce*, any motor vehicle dealer:

(1) to accept, buy[,] or order any motor vehicle or vehicles, *** parts[,] *** or any other commodity or commodities *** which such motor vehicle dealer has not voluntarily ordered or requested ***; or to require a motor vehicle dealer to accept, buy, order[,] or purchase such items in order to obtain any motor vehicle or vehicles or any other commodity or commodities which have been ordered or requested by such motor vehicle dealer;
***

(3) to order for anyone any parts, accessories, equipment,

machinery, tools, appliances[,] or any commodity whatsoever ***." (Emphases added.) 815 ILCS 710/4(c)(1), (c)(3) (West 2000).

Plaintiff argues that section 8 of the Act makes sections 4(c)(1) and (c)(3) applicable to the agreement itself. Section 8 provides: "The provisions of this Act shall apply to all written or oral agreements between a manufacturer *** with [*sic*] a motor vehicle dealer[,] including, but not limited to, *** the franchise agreement *** and all such other agreements in which the manufacturer *** has any direct or indirect interest." 815 ILCS 710/8 (West 2000). According to plaintiff, even though the parties contractually agreed that defendant could require plaintiff to order a reasonable amount of vehicles and parts, sections 4(c)(1) and (c)(3) invalidate that contractual provision because the provision is "coercive." Contractual provisions that violate public policy expressed in statutory law are unenforceable and void. *People ex rel. Callahan v. Marshall Field & Co.*, 83 Ill. App. 3d 811, 818, 404 N.E.2d 368, 373 (1980). Plaintiff argues that by virtue of a severability clause in the agreement, the rest of the agreement survives.

Defendant observes that under plaintiff's interpretation of section 4(c), defendant could not demand that plaintiff order so much as one vehicle or one part, even though plaintiff promised to maintain a "suitable inventory." Boldly embracing that *reductio ad absurdum*, plaintiff replies that defendant is correct. Plaintiff suggests, however, that defendant's dilemma is not as dire as it might first appear, because defendant still has the option of terminating the franchise for "good cause," after giving the statutorily required notice. See 815 ILCS 710/4(d)(6) (West 2000). Section 2(v) of the Act defines "[g]ood cause" as "facts establishing commercial reasonableness in lawful or privileged competition and business practices as defined at common law." 815 ILCS 710/2(v) (West 2000). Plaintiff further points out that dealers have an incentive to order enough vehicles and parts to run a viable dealership and turn a profit.

If it is permissible, under the Act, for a manufacturer to send an underperforming dealer a "nasty surprise" in the form of a notice of termination, we do not understand why it is impermissible to require the dealer to acknowledge the standards of performance the dealer must meet under the contract, thereby preventing a "nasty surprise." While arguing it is "coercion" to require a dealer to sign and comply with annual addenda, plaintiff concedes it is perfectly legal for a manufacturer to communicate to a dealer the manufacturer's "expectations" or "goals." Given plaintiff's understanding of "coercion," we do not see how the former method of influencing the dealer is inherently more "coercive" than the latter method. The

same potential outcome looms ahead for the nonfulfillment of an addendum or an expectation: termination of the franchise, subject to commercial reasonableness.

■ Under section 2(v), the common law provides the standard for determining commercial reasonableness. By negative corollary, it can provide the standard for commercial unreasonableness as well. The common law regards coercion as commercially unreasonable behavior. We can ascertain, from the common law, what coercion is and is not. "Coercion" and "duress" have essentially the same meaning: overpowering another's free will by imposition, oppression, or undue influence. *In re Marriage of Flynn*, 232 Ill. App. 3d 394, 401, 597 N.E.2d 709, 713 (1992). A demand is not duress unless it is "wrongful" in the sense that it violates the law, a contract, or morality. *Carlile v. Snap-on Tools*, 271 Ill. App. 3d 833, 840, 648 N.E.2d 317, 322 (1995). "Duress cannot be predicated upon a demand which is lawful or upon one's doing or threatening to do that which one has a legal right to do ***." *Carlile*, 271 Ill. App. 3d at 840, 648 N.E.2d at 322.

Plaintiff argues that under section 4(c), the parties could not validly stipulate, in their agreement, that defendant could require plaintiff each year to purchase a specified quantity of trucks and parts. Such a provision, plaintiff argues, would be "coercive," even if the required quantity of trucks and parts were reasonable. That argument begs the question of what "coercion" is. "Coercion" does not mean "compulsion" or "constraint" in every shape and form, such as demanding that someone perform a contract. Under the common law, "coercion" is a wrongful demand (*Carlile*, 271 Ill. App. 3d at 840, 648 N.E.2d at 322)—which necessarily excludes a demand to fulfill promises one freely made in an arm's-length agreement.

When prohibiting "coercion" in section 4(c), the legislature surely assumed that franchisees, by and large, would be responsible business persons willing to perform the promises they made in the franchise agreement (or else, one would think, they would not have entered into the agreement in the first place). Because the legislature assumed that franchisees would willingly fulfill the contractual promises they willingly made, the legislature must not have intended "coercion" to include a demand to perform a contract.

In the agreement, plaintiff promises to (1) "carry in stock an adequate inventory of unsold new HN80 [v]ehicles," (2) "carry an inventory of parts in accordance with [defendant's] minimum[-] inventory requirements," (3) "keep competent personnel in sufficient numbers," and (4) "maintain complete service facilities." Plaintiff could have had no doubt what constituted, for 2001, an "adequate inventory," a "sufficient number" of personnel, and "complete service

facilities" within the meaning of defendant's offer, because defendant sent the 2001 addendum to plaintiff two months before the parties signed the agreement. Paragraph VII of the agreement expressly incorporates the 2001 addendum—whether plaintiff signs the 2001 addendum or not. According to paragraph VII, future addenda are incorporated into the agreement only if the parties sign them, but signing the 2001 addendum is not a condition of its incorporation into the agreement.

■ The 2001 addendum has a line for plaintiff's signature, which plaintiff left blank. Signing the 2001 addendum, however, was not the only permissible way to manifest acceptance of it; plaintiff accepted the 2001 addendum by signing the agreement, which expressly incorporated the 2001 addendum. The agreement is predominantly for the sale of goods and, therefore, comes within article 2 of the Uniform Commercial Code-Sales (UCC) (810 ILCS 5/2—101 through 2—725 (West 2000)). See *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 352-53, 770 N.E.2d 177, 194-95 (2002). Section 2—206(1)(a) of the UCC provides: "Unless otherwise *unambiguously* indicated by the language or circumstances[,] *** an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances." (Emphasis added.) 810 ILCS 5/2—206(1)(a) (West 2000). Because defendant's offer did not say, clearly or otherwise, that signing the 2001 addendum was the only permissible way to accept it, plaintiff could accept the 2001 addendum by signing the agreement, of which the 2001 addendum was expressly a part. The signature line in the 2001 addendum was merely a suggested, rather than a clearly prescribed, means of manifesting acceptance of the 2001 addendum. See *Calo, Inc. v. AMF Pinspotters, Inc.*, 31 Ill. App. 2d 2, 9, 176 N.E.2d 1, 5 (1961); Restatement (Second) of Contracts § 60 (1981); 1 W. Jaeger, Williston on Contracts § 76, at 250 (3d ed. 1970).

It is not against the law or public policy for a dealer to enter into a contract with a manufacturer to buy a specified number of trucks, parts, and tools and to employ a specified number of personnel. Once a dealer has freely entered into such a contract, it is not coercion to demand that the dealer perform it. Otherwise, all franchise agreements would be illegally coercive.

Like section 4(c) of the Act, sections 1221(e) and 1222 of the federal Automobile Dealers' Day in Court Act (Day in Court Act) (15 U.S.C. §§ 1221(e), 1222 (2000)) prohibit a manufacturer from coercing or threatening to coerce a dealer. *Cf. Colonial Dodge, Inc. v. Chrysler Corp.*, 11 F. Supp. 2d 737, 744 (D. Md. 1996) ("While there are slight differences between the [Maryland] and federal statutes, 'coercion'

under both the [s]tate [a]ct and the [Day in Court Act] embodies the same concept, and accordingly the same analysis applies"). Federal courts have held that demanding the performance of a contractual obligation is not "coercion" within the meaning of the federal statute, because such a demand is not "wrongful." *E.g., Empire Volkswagen Inc. v. World-Wide Volkswagen Corp.*, 814 F.2d 90, 96 (2d Cir. 1987); *Bronx Chrysler Plymouth, Inc. v. Chrysler Corp.*, 212 F. Supp. 2d 233, 245-46 (S.D.N.Y. 2002); *Ed Houser Enterprises, Inc. v. General Motors Corp.*, 595 F.2d 366, 370 (7th Cir. 1978). We find the reasoning in those cases to be applicable to the present case.

Plaintiff argues that not only the 2001 addendum but all succeeding annual addenda are invalid and unenforceable under section 4(c) as instruments of exploitation. Plaintiff's argument rests on a highly questionable syllogism, namely, that because defendant can issue addenda, it can require dealers, in those addenda, "to buy unlimited amounts of vehicles, parts, inventory, and tools or face the prospect of losing their franchise." The agreement requires plaintiff to have a "suitable" inventory: only enough vehicles and parts "necessary to fulfill [plaintiff's] obligations" to "conscientiously and diligently promote the sales of [defendant's] products and obtain and maintain a reasonable share of the market for such products in [plaintiff's] [a]rea of [r]esponsibility." Plaintiff must have an "adequate parts inventory": only enough parts to provide "prompt, reliable[,] and effective service."

Depending on such factors as conditions in the market, the recent performance of plaintiff's dealership, and changes in the design of defendant's vehicles, it would seem that what constitutes a "suitable" inventory could change from year to year and it is therefore impossible to state in advance the specific requirements for future years. If, for example, the demand for defendant's trucks spikes sharply upward, the market might support a larger inventory than in previous years, and a conscientious and diligent dealer might acquire a larger inventory. Fifteen trucks might not be enough if the trucks become hugely popular.

The addenda are supposed to specify what plaintiff's promises entail in the context of current circumstances. Thus, contrary to plaintiff's assertion, the addenda are not blank checks in which defendant can specify whatever quantities it pleases. The requirements in each addendum must be commercially reasonable. See 810 ILCS 5/2—306(1) (West 2000) (pursuant to a requirements contract, "no quantity unreasonably disproportionate *** to any normal or otherwise comparable prior *** requirements may be tendered").

We recognize that the process of issuing annual addenda can be

abused. In explaining what is a "wrongful demand" for purposes of the Day in Court Act, the federal Court of Appeals for the First Circuit stated:

"[W]e think there is an important difference between two kinds of improper conditions that a manufacturer might impose and back up by threats. Particularly suspect under the [Day in Court Act] are conditions which benefit only, or primarily, the manufacturer—for example, requirements that a dealer purchase large stocks of vehicles, spare parts, special tools[,] or advertising—as distinguished from requirements that would tend to work to the mutual advantage of both parties, for example, that the dealer improve its service ***." *Volkswagen Interamericana, S.A. v. Rohlsen*, 360 F.2d 437, 442 (1st Cir. 1966).

■ Requiring a dealer to buy unreasonably large amounts of vehicles, parts, and tools on pain of termination of the franchise would be a wrongful demand not contemplated in the agreement and, therefore, "coercion" or an "attempt to coerce" within the meaning of section 4(c) of the Act. Defendant must be able to defend its addenda by reference to objective criteria (including, perhaps, conditions in the market and the performance of other dealers in the region). Plaintiff does not contend that the 2001 addendum is substantively unreasonable—and such a contention would be unavailing, anyway, because plaintiff agreed to that addendum. Plaintiff has not pleaded that the quantities of vehicles, parts, tools, and personnel specified in addenda issued after 2001 are substantively unreasonable, or that the quantities exceed the standard of "adequacy" or "suitability" in the agreement.

### C. Unreasonable Restrictions and Unilateral Modification

■ Section 7 of the Act states:

"It shall be unlawful directly or indirectly to impose unreasonable restrictions on the motor vehicle dealer or franchisee relative to *** termination, discipline, *** compliance with subjective standards[,] and assertion of legal or equitable rights." 815 ILCS 710/7 (West 2000).

■ Plaintiff contends that the process of issuing annual addenda "unreasonably restricts" plaintiff in two ways: (1) it imposes subjective requirements on plaintiff and (2) it unilaterally modifies the agreement. As we have explained, if an addendum has no objective basis and, as a pretext for unreasonably increasing defendant's profits, requires plaintiff to buy an unreasonably large quantity of goods, it violates the Act. Plaintiff has not pleaded, however, that the quantities in any of the addenda defendant has issued thus far exceed what is needed for an "adequate inventory" or "complete service facilities."

Focusing instead on the process of issuing addenda, plaintiff contends that the substantive reasonableness of the addenda is irrelevant—a contention with which we disagree.

The agreement requires plaintiff to maintain an "adequate inventory" and "complete service facilities." These terms suffer from the indefiniteness inherent to requirements contracts. Indisputably, however, an "adequate inventory" for, say, 2002 means *some* specific quantity of trucks and parts. "Complete service facilities" means *some* specific quantity of tools and personnel. If, for example, 15 trucks and $400,000 in parts were in fact merely an "adequate inventory" for 2002, it could not have been a unilateral *modification* of the agreement to have required, in an addendum, that plaintiff have 15 trucks and $400,000 in parts in its inventory that year. All requirement contracts have open quantity terms, and if giving substance to those terms at a particular point in time were a modification of the contract, no requirements contract would be enforceable. Whether an addendum is an attempt at a unilateral modification depends on whether the quantities it specifies conforms to the general requirements of the agreement.

The process of issuing and executing annual addenda is analogous to an assurance of performance. See 810 ILCS 5/2—609 (West 2000). Normally, a party must have "reasonable grounds for insecurity" when demanding an assurance of performance from the other party. 810 ILCS 5/2—609(1) (West 2000). The agreement allows defendant to demand from plaintiff one such assurance each year, in the form of a signed addendum, without any grounds for insecurity. See 810 ILCS 5/1—102(3) (West 2000) ("The effect of provisions of this Act [(the UCC)] may be varied by agreement").

### D. Arbitrary and Unconscionable

■ Section 4(b) of the Act states: "It shall be deemed a violation for any manufacturer *** to engage in any action with respect to a franchise which is arbitrary, in bad faith[,] or unconscionable and which causes damage to any of the parties or to the public." 815 ILCS 710/4(b) (West 2000).

■ Plaintiff complains it was arbitrary and unconscionable to impose the 2001 addendum on plaintiff when the year 2001 was already half over. Richards did not send the 2001 addendum to plaintiff until July 3, 2001. Plaintiff admits that Richards explained, in a letter of that date, "that even though these sales requirements are computed and presented as annual figures, in 2001 dealers will be evaluated based on their retail sales performance in the second half of the year (July-December[ ] 2001), compared to 50% of the stated sales require-

ment." Plaintiff complains, however, that "notice was not sent to [plaintiff] until July 3, 2001, *after* the terms of the 2001 [addendum] were purportedly in effect" and the 2001 addendum is, therefore, arbitrary and unconscionable. (Emphasis in original.)

Plaintiff does not appear to be a naive consumer. Plaintiff received Richards's letter in July 2001. Two months later, plaintiff signed the agreement. We think that plaintiff's execution of the agreement is an admission that the terms of the letter, of which plaintiff now complains, were not arbitrary or unconscionable. Contrary to plaintiff's contention, defendant did not "make up the rules after the game began." The "game began" when plaintiff signed the agreement—with full knowledge of the "rules."

## III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

Affirmed.

KNECHT and McCULLOUGH, JJ., concur.